# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF CALIFORNIA.

---

[The cause of Leese and Valejo *v.* Clarke, and that of Vanderslice and Clarkson *v.* Hanks, were decided at October Term, 1852, but as a rehearing was granted at January Term, 1853, in the latter case, for the purpose of reconsidering the principles of law involved in both cases, it was deemed proper to delay the report of both, till the publication of the present volume, so as to present the law, as it might be ultimately decided.

A report of the rehearing and final decision of the court in the case of Vanderslice and Clarkson *v.* Hanks will be found in its proper place, in January Term of this volume.]

## LEESE and VALEJO, Appellants, *v.* CLARKE, Respondent.

*Quære.* If the courts of this state can entertain jurisdiction of titles to land granted by a Mexican governor, antecedent to the acquisition of the country by the United States, without previous confirmation or legislative recognition?

Prior to the 24th May, 1821, the laws or decrees of the kings of Spain, and the regulations or usages of their governors (who were mere deputies), sanctioned by royal approval or acquiescence, afforded the proper tests by which to determine the validity of grants.

Since the revolution (24th February, 1821), no valid alienation could be made, except by an act of Mexican sovereignty.

By the law of the Mexican Congress of 18th August, 1824, limited and defined by that of November 21st, 1821, the governors of territories were authorized to

2

grant, with certain specific exceptions, vacant lands, &c. By these laws and the legislation of the departmental legislature, consistent therewith, must be determined the validity of any grant of land in California.

To these regulations this court alone look, and by them every grant must be determined. If not fully complied with, the title did not pass, but remained in the government of Mexico.

A mere grant, without further compliance with the requisitions, is at best, but an inchoate title, and the *land* passed to the United States, who hold it subject to the trust imposed by the treaty of cession and the equities of the grantees.

The execution of this trust is a political power to which the judiciary is not competent.

Where the title of the plaintiff is inchoate and incomplete, he cannot sustain an ejectment, and the court properly excluded such title as testimony.

APPEAL from the Superior Court of San Francisco.

The complaint in this case alleged that, on the 12th May, 1839, the plaintiffs petitioned the Governor of Alta California, Juan B. Alvarado, at Monterey, the capital thereof, in consideration of certain moneys advanced, and services rendered the government in California, to grant to them two certain lots of land, of one hundred varas each, with twenty-five varas in the sea, commencing at the Embarcadero of Yerba Buena, as follows (here proceeds the description in Spanish, and afterwards translated into English): that on the 21st day of May, 1839, the said Alvarado, in virtue of his authority as governor, and in accordance with the said petition, ceded and granted to the plaintiffs the said two hundred varas of land, with the twenty-five varas in the sea, at the place designated in the said petition, thereby granting the absolute property in fee to said land to the plaintiffs, as by a copy of said petition and grant, herewith filed, will appear; that all the land so granted is within the limits of the city of San Francisco, and the twenty-five varas in the sea within the present harbor or Bay of San Francisco, and the place designated in the grant as the Embarcadero, or landing-place, of Yerba Buena, is at the foot of the street known on the map of San Francisco as Broadway, which street intersects with the water line of the bay at high water. The plaintiffs further show, that the defendant, H. T. Clarke, is now in possession of a certain portion of said two hundred varas of land, against the consent of the plaintiffs, and

without their authority,—that portion on the map of said city known as lot No. 327 (describing it), and refuses to deliver possession of said portion (as well as other portions of said land, of said twenty-five varas in the sea, which the said defendant claims against the consent and authority of the plaintiffs) although demanded, &c.

That said defendant is indebted to said plaintiffs in the sum of $200,000, for the withholding of said land, and for the issues, use, rents, and occupation thereof, and refuses to pay therefor. The plaintiffs therefore pray that defendant may be condemned to deliver up to the plaintiffs the said lot, as above described, as a portion of the two hundred varas, and to pay to them the said amount of money for the use, &c., thereof, together with costs, &c.

The defendant, for answer, denies all and singular the allegations of the said complaint, and requires strict proof.   And further, says, that he has no knowledge of the pretended grant mentioned in said complaint, and denies that any such grant was ever made, has no knowledge of the pretended original document, whereof pretended copies and translations are filed, and denies the same, and requires proof.   And denies that said pretended grant covers any portion of property in possession of defendant, or that any of the property described as in the possession of defendant is covered by the said pretended grant, and denies that plaintiffs have any right, claim, or title whatever, to any portion of the property described in said complaint as in the possession of said defendant, and denies indebtedness to plaintiffs in any sum whatever, &c., and prays to be dismissed with costs, &c.

A great deal of evidence was given on the part of the plaintiff in support of the several allegations of this complaint, and a great many exceptions taken, when the following offer was made.

"Plaintiffs' counsel then offered in evidence the grant from Juan B. Alvarado to plaintiffs, dated Monterey, 21 de Mayo de 1839, for the purpose of showing color of title, and the title under which the plaintiffs entered upon the land described in the grant, including this land in controversy, and the immediate and exact boundaries of the land; to which the defendant's counsel

objected, and the court sustained the objection, to which plaintiffs' counsel excepted."

The grant mentioned in the preceding offer was founded upon the petition of the plaintiffs. And both are placed upon the record, in the Spanish language, accompanied by translations, as follows.

(TRANSLATION OF PETITION.)

To the most excellent governor of Upper California, Don Juan Baptiste Alvarado.

We, the undersigned, Jacob P. Leese and Salvador Valejo, appear before your excellency in the best form, and say that, considering that the want of funds in the treasury of the country prevents your excellency from repaying us the expenses we have made, by your order, in boats, transportation of troops, couriers, and other services, including those made by us personally, at this place, at Santa Clara, San Jose, Sonoma, and San Rafael, for the restoration of public tranquillity, we have thought proper to enter into a contract with Pedro Kostronutineoff, the commander of Ross, to build some houses, stores, and a wharf, at this place, and so we require two lots for the said buildings ; we pray your excellency to grant us two lots, of one hundred varas each, at the point known as the Desembarcadero (landing-place) of Yerba Buena, the said lots beginning at the point of the Desembarcadero, (and running) on the sea-shore as far as the Ployita, in a northerly course, making the front of two hundred varas, and in depth east and west one hundred varas, towards the hill ; we also ask for twenty-five varas in the sea, from the point of the Desembarcadero itself, for the construction of a wharf, which we mentioned. We therefore pray your excellency to grant us the favor, which we shall receive with thanks; excusing us for using common paper, as there is none stamped.

JACOB P. LEESE.<br>SALVADOR VALEJO.

San Francisco, May 12, 1839.

(COPY OF TRANSLATION OF GRANT.)

"Monterey, May 21st, 1839.

[SEAL.] " The two lots, of one hundred varas each, are granted to the petitioners, Don Jacobo Leese and Don Salvador Valejo, at the place and with the boundaries which they described, for the purpose of erecting their stores; upon the conditions hereinafter set forth, provided the commandant at the Presidio at Ross, is to have no right whatever to the said grant, as the land granted is considered as the property of Mexicans, as the above-named petitioners are : 1st. At no time, and for no cause whatever, shall the commander of Ross regard himself as the owner of the stores, as all the buildings which may be constructed are to be regarded as the property of a Mexican citizen. 2d. This license does not destroy, nor in any way injuriously affect, the laws or dispositions of the government of the nation, or of that of this department, with respect to the trade or the privileges which the Russians may or may not heretofore enjoy, on entering the Bay of San Francisco for the purposes of trade, as their private contract does not authorize any right of any kind, either as regards the individuals interested, or the trade above mentioned. 3d. The wharf which is to be constructed, cannot be exclusively for the benefit of individuals, but shall be considered as the property of the government, for the use of trade in general. The government itself will impose such wharfage duties as it may consider proper. 4th. If the persons to whom this favor is granted should contravene these provisions, they shall lose their rights, as well to the buildings as to the lots awarded to them, which shall belong to the nation, for such uses as it may choose to make of them.

" I, Don Juan B. Alvarado, the Governor of the Department of California, order this to be delivered to the petitioners, to serve as a title for them ; note being entered thereof on the proper book.

"JUAN B. ALVARADO.

" MANUEL JIMENO.
"Secretary of the State."

"Note has been taken hereof, in the office under my charge, in the book kept for this purpose, seat of,

"JIMENO.

"Monterey, May 21st, 1839."

After the said offer, including the grant, was rejected by the court, the plaintiff proceeded with his testimony at length, and was succeeded by the defendant. But for the reasons given in the opinion of this court, it is not necessary to report the exceptions taken to the testimony, further than the one already mentioned, upon which the decision of the case turned.

The jury found for the defendant, and the plaintiffs appealed. (There are no briefs on file.)

MURRAY, Chief Justice, delivered the opinion of the court.

ANDERSON, Justice, concurred; "that the judgment of the court below be affirmed."

This was an action of ejectment brought by the appellants to recover possession of a certain tract of land, situated in the City of San Francisco. The whole record is encumbered with exceptions to the various rulings of the court below, which are unnecessary to be considered, as the case must ultimately turn on the question, whether the grant under which the plaintiffs claim title is sufficient in law to sustain an ejectment.

The grant under which plaintiffs claim, purports to have been made to them May, 21st, 1839, by Alvarado, Governor of California, prior to its acquisition by the United States.

Assuming for the present that the courts of this State can entertain jurisdiction of titles of this description without previous confirmation or legislative recognition, a position to which this court is by no means to be considered as assenting, and that the land in question was public domain of Mexico at the time of its alienation, it is necessary for us to ascertain the regulations established by the government of Mexico in relation to grants of land, and whether the present one under consideration is sufficient and in conformity to the law.

It may be as well to observe in the outset, that the authorities cited by counsel and supposed to be conclusive by many in relation to the decisions of Louisiana and Florida land claims, and

the laws and decrees of Spanish monarchs, together with the usages of the royal councils and governors, have no particular weight as authority in the decision of this case.

Prior to the Mexican revolution which produced the Plan of Igula, February 24, 1821, the unappropriated lands in this country constituted a part of the domain of the Spanish monarchs, who alone represented and exercised the sovereignty of the Spanish nation. The royal governors were the mere deputies of the king, and exercised the sovereignty in his name.

His will, manifested in the form prescribed by his regulations, operated as a valid alienation of the public domain. His governors, acting under his authority, and in his name, were the mere executors of his will—whence the law or decrees of the kings, and the regulations and usages of their governors, sanctioned by royal approval or acquiescence, afforded the proper tests by which to determine the validity of grants of land belonging to the nation whose sovereignty those kings represented and exercised, and they are accordingly consulted and relied upon by the courts of the United States in adjudicating Spanish claims in Florida and Louisiana. But on the 24th of February, 1821, the relation between Mexico and Spain ceased, and the sovereignty became vested in the Mexican nation; and since that time no valid alienation could be made in any of the territories of Mexico, except by an act of Mexican sovereignty. The royal decrees, regulations, and usages, ceased to have any effect whatever as to subsequent grants of lands.

This point was determined by the Mexican Congress, in a case which arose shortly after the independence of that government, and has ever since been acquiesced in. On the 17th of January, 1821, the elder Austin obtained an inchoate grant of lands from the royal governor of Texas. On the 19th of August, the Mexican governor of that province (Martinez), assuming the powers properly exercised by the royal governors, modified the grant in favor of the younger Austin.

Had the royal laws and usages still continued to retain their force, the acts of Martinez would have been valid, but the Mexican government, at the same time it recognized the act of the royal governor as valid, because done before the change of

sovereignty, refused to confirm the act of its own governor, done after the change, on the ground that the sovereignty could be exercised only by the Mexican nation. The subject attracted public attention, and the Mexican Congress were about passing a general law in relation to the alienation of public lands, when Iturbide forcibly dispersed the members of that body, and caused himself to be proclaimed emperor.

On the 4th of January, 1823, he promulgated a general law on the subject, but being shortly afterwards deposed, Congress, on the 11th of April, 1823, suspended that law. On the 18th of August, 1824, Congress enacted a general colonization law, prescribing the mode of granting public lands throughout the Mexican territory. (1 White's Recap. 561, 8, 71, 76, and 82.)

That law was limited and defined by a series of regulations ordained by the Mexican government (November 21, 1828). By these laws and regulations, which have ever since continued in force, the governors of territories were authorized to grant, with certain specified exceptions, vacant lands, &c. (Congressional Documents relative to California, 1850, p. 120–1.)

By the fundamental law of '24, the regulations of 1828, and the legislation of the departmental legislature consistent therewith, must be ascertained and determined the validity of every grant of land in California.

Art. 2d, of the Act of '28, declares, that within it are comprehended, "those lands of the nation, not the property of individual corporations or towns, which can be colonized." The 3d article provides, that "the legislatures of all the States will, as soon as possible, form colonization laws, regulating for their own States, conforming themselves in all things to the constitutional acts, general constitution, and the regulations established in this law."

The 4th article provides, "that no lands shall be colonized within twenty leagues of the limits of any foreign nation, nor within ten leagues of the coast, without the previous approbation of the supreme executive power."

The first article of the regulations of '28, referred to, declares that "the governors of territories are authorized, in compliance with the law of '24, and under the conditions hereinafter speci-

fied, to grant vacant lands in their respective territories, &c., for the purpose of cultivating and inhabiting them."

Art. 2d. "Every person soliciting lands shall address to the governor of the territory a petition, describing, as distinctly as possible, by means of a map, the land asked for."

Art. 4th. "The governor will accede, or not to such petitions, in exact conformity to the laws on the subject, and especially to the laws of 1824."

Art. 5th and 6th. "The grants so made shall not be held to be definitively valid, without the previous consent of the territorial deputation, to which end the respective documents (*expedientes*) shall be forwarded to it. When the governor shall not obtain the approval of the territorial deputation, he shall report to the Supreme Government, forwarding the necessary documents for its decision."

Art. 8th. "The definitive grant asked for, being made, a document, signed by the governor, shall be given, to serve as a title to the party interested, *wherein it must be stated*, that said grant was made in exact conformity with the provisions of the law, in virtue whereof possession shall be given."

Art. 9th. "The necessary record shall be kept in a book, destined for the purpose, of all the petitions presented and grants made, with the maps of the lands granted, &c."

I have cited these regulations to show that the alienation of the public domain of Mexico was a subject of careful consideration with that government, hedged around with an infinity of restrictions for the protection of the sovereignty, and that the loose and careless conduct of her governors, in executing this trust, was not approved by the Supreme Government, although removal from the scene, and the insignificant value of the lands at that time, seemed to divert public attention from these abuses.

To these regulations this court can alone look, and by them every grant must be determined. Had we the power to discriminate, its exercise would be more dangerous, and productive of more injustice, than the total inability to go beyond them.

If the officers of the Mexican government, to whom was confided this trust, exceeded their authority or neglected the solemnities and formalities of the law, this court is bound to take

notice of it, and cannot shield those claiming under such titles from the necessary consequences of ignorance, carelessness, or arbitrary assumptions of power.

The grant from Alvarado to Leese and Valejo contains nothing but a petition and grant of the governor. There is no map attached, no survey, record, or evidence, that the plaintiffs have ever been put in judicial possession, no act of the territorial deputation confirming the act of the governor, or evidence that the grant, together with the map, were recorded in a book, kept by law as a record of said grants, as provided in sec. 9th of the Act of '28. But that these requisitions must be fully complied with, this court has no doubt, without which a severance of the land from the public domain and a rigid adherence in all other respects, the title did not pass to the grantees, but remained in the government of Mexico.

The title at best can only be considered as inchoate. It passed with the map of the property of Mexico to the United States, who now hold it, subject to the trust imposed by the treaty of cession and the equities of the grantees.

The execution of this trust, however, is a political power, to which the judiciary is not competent, until made so by legislation. Wenvard v. Massey, 8th Howard; Boisdu v. United States, ibid.

In the case of Wenvard v. Massey, already cited, the court held, that every step pointed out by the law must be complied with, and although a grant and survey were regularly recorded, yet without the approval of the Intendant General, the grantee did not become the owner, and the title remained in the sovereign, notwithstanding the Intendant always confirmed the grants, or had never been known to reject one.

If the governor of California possessed any authority to make this grant, and the land so granted was at the time part of the public domain of Mexico, then the government of Mexico retained the power to confirm or reject it. That power was a political one, and passed to the United States under the treaty of cession, to whom the exercise of it belongs. In the same case, the court held that, "No suit can be brought in an ordinary action of ejectment on a concession and survey, for want

of strict legal·title to sustain it.  Such claimants were not regarded as the owners of the land, until the real title was delivered, completed, in the language of Spanish regulation.  It was therefore manifest, that claims resting on the first incipient steps, must depend for their sanction and completion upon the sovereign power.

"No standing has therefore ever been allowed in any ordinary judicial tribunal, until Congress has confirmed them, and vested the legal title in the plaintiff."

Many arguments have been adduced to demonstrate, that the grant to Leese and Valejo is absolutely void.  It is not our purpose to follow this matter further than the necessities of the case require.

Holding as we do that the law of '24, and the regulations of '28, must be strictly complied with, that the title of the plaintiffs at best is inchoate and incomplete, and therefore insufficient to maintain ejectment, we are of opinion the court below properly excluded it as testimony.  Whatever errors may be found in the record on other points is a matter of no moment, and the court sees no reason for sending this case back.

The judgment of the court below is therefore affirmed.