GRISAR v. McDOWELL.

1. By the laws of Mexico, which prevailed in California at the date of the conquest, pueblos or towns, when once established and officially recognized, were entitled, for their benefit and the benefit of their inhabitants, to the use of lands, embracing the site of such pueblos or towns, and of adjoining lands within certain prescribed limits. These laws provided for an assignment to the pueblos of such lands, which were not to exceed in extent four square leagues. The assignment was to be made by the public authorities; and the land was to be measured off in a square or prolonged form, according to the nature and condition of the country. All lands within the general limits stated, which were required for public purposes, were reserved from the assignment.

2. Until the lands were definitely assigned, the right of the pueblo was an imperfect one. The government might refuse to recognize it at all, or might recognize it in a qualified form, and it might be restricted to less limits than the four square leagues. After the assignment, the right of

use and disposition (a limited one) was subject to the control of the government of the country.

3. Though historical evidence and judicial decision show that there was a Mexican pueblo of some kind, on the conquest of California, at what is now the site of San Francisco, one entitled to the usual rights of pueblos, no assignment of lands was ever made to it under the former government. Its right to any lands required, accordingly, recognition from the United States before it could be turned into an indefeasible estate; and until the land claimed under the pueblo right was set off and measured by its authority, the government could set apart and appropriate any portion of it which might be required for public uses.

4. The necessity of such recognition by the new government is not dispensed with by the presumption raised by the fourteenth section of the act of March 3d, 1851, of a grant of land to a town which was proved to have been in existence on the 7th of July, 1846.

5. The proceeding in the District Court of the United States in a California land case, on an appeal from the board of land commissioners, is an original suit, and the whole case is open.

6. An appeal from a decree of the District Court to the Supreme Court, in California land cases, suspends the operation and effect of the decree only when, by a judgment of the Supreme Court, the claim of the confirmee in the premises in controversy may be defeated.

7. In the execution of its treaty obligations with respect to property claimed under Mexican laws, the government may, if it please, act by legislation directly upon a claim preferred, withdrawing it from further consideration of the courts under the provisions of a general act. Accordingly, an act by which all the right and title of the United States to the land within the corporate limits of San Francisco confirmed to the city by a decree of the Circuit Court, were relinquished and granted to that city, and the *claim of the city was confirmed, subject, however, to the reservations and exceptions designated in the decree, and upon certain specified trusts*, disposed of the city claim, and determined the conditions upon which it should be recognized and finally confirmed.

8. The decree of the board of land commissioners in California land cases, or of the courts of the United States, where it becomes final, takes effect by relation as of the day when the claim was presented to the board of land commissioners.

9. According to the practice of the government, as recognized by Congress, the President may reserve from sale and set apart for public use, parcels of land belonging to the United States. And he may modify, by reducing or enlarging it, a reservation previously made. That he has made the modification on a compromise of an opposing private claim, does not invalidate the reservation.

ERROR to the Circuit Court for California; the action there having been to recover possession of a tract of land within the city of San Francisco.

The plaintiff claimed as seized in fee under title from the city of San Francisco. The defendant claimed possession as an officer of the United States; setting up that the property was public property of the United States reserved for military purposes.

The city's title was thus: It seemed to be sufficiently plain, from historical evidences and from adjudicated cases, that at the time of the conquest of California by the United States, there was at the present site of San Francisco a pueblo of some kind; that is to say, that there was a settlement or collection of individuals there having an ayuntamiento composed of alcaldes, regidores, and other municipal officers.*

It seemed sufficiently plain also that there were general Mexican-laws governing the subject, which authorized territory to an extent not exceeding four square leagues to be marked out and dedicated to the use of pueblos and of their inhabitants for certain purposes.

What, however, was the precise nature of this pueblo at San Francisco, or what the nature of its rights or of pueblo rights generally in any four leagues, and by what lines these particular four leagues were to be defined, was not so clear, nor at all conceded: though it was asserted by the plaintiff that the four leagues in immediate connection with San Francisco, were to be measured from the presidio of the old pueblo, the place occupied by the garrison of the town; and hence were to be bounded of necessity on three sides by waters of the ocean, the bay, and the Golden Gate. And it was shown that a line drawn from water to water, east and west, would segregate in the easiest manner the four leagues to which, as successor of the former pueblo, the city was entitled.

If such a line had ever been drawn, the tract now in controversy would have been included within it. But there was no evidence that any assignment of land had ever in any

---

* See Dwinelle's Colonial History of the City of San Francisco; Hart v. Burnett, 15 California, 540; where the general character of the documentary evidence of the existence of the pueblo, and of the rights it possessed, is set forth and considered.

way been made to the pueblo where San Francisco now stands, under the former government.

On the 3d of March, 1851, Congress passed the act to ascertain and settle private land claims in California. This act by its eighth section makes it the duty of every person having claims to lands there, to present them for investigation and the evidence in support of them, to a board of commissioners, which was created by the act. The fourteenth section declared, however, that the general requirements of this eighth section should not extend to " any town lot, farm lot or pasture lot held under any grant from any corporation to which lands may have been granted for the establishment of a town by the Spanish or Mexican government, or the lawful authorities thereof, nor to any city, town, or village lot, which city, town, or village, existed on the 7th day of July, 1846, but that the claim for the same shall be presented by the corporate authorities of said town," and that "the fact of the existence of the said city, town, or village, on the said 7th of July, 1846, being duly proved, shall be *primâ facie* evidence of a grant to such corporation."

In July, 1852, the city presented to this board a claim for the four leagues, praying a confirmation; and in December, 1854, the board confirmed the claim to a portion of the land, in which portion were embraced the premises now in controversy.

In June, 1855, in virtue of an ordinance known as the Van Ness Ordinance, passed by the common council of the city of San Francisco, and subsequently, in 1868, ratified and confirmed by the legislature of California, whatever right the city had to the premises in controversy, on the 1st January, 1855, passed to a party under whom the plaintiff claimed.

Such was the plaintiff's case.

By the defendant's, it appeared, that in November, 1850, the President of the United States made, through the War Department, and in a usual way, an order that a certain parcel of land described by him, situated on the bay of San

Francisco, California, and which, it was said by one side here, did, in point of fact, embrace the premises in controversy, and by the other that it did not—should be exempted from sale and reserved for public purposes. A private claimant to this tract proposing subsequently that certain other bounds should be substituted, with the understanding that if this was agreed to by the government he would resign all pretensions to title within the reservation, as fixed by the modified boundary proposed, the President, in December, 1851, in compliance with a recommendation to that effect from the Engineer Department, made in October, 1851, modified and reduced the reservation, describing it more particularly, and in such a way as to divide the tract originally reserved into two separate tracts, and, as it was said on one side here, to include also, land *not* included in the original order. In one of these tracts, the premises in controversy were embraced.

The fact, therefore, that the President had reserved the tract for the purposes of the Federal government, was one part of the defendant's case. Another was this:

In stating the city's title it has been said that the board of land commissioners, in December, 1854, confirmed the claim of the city to a part of the four leagues claimed by it as a pueblo, which part included these premises. If the matter had stopped there, the case of the plaintiff might have been free from question. But it did not stop there. The sequel was thus:

In March, 1856, a transcript of the proceedings and decision of the board was filed in the District Court of the United States; this operating under the statute of August 31st, 1852, as an appeal by the party against whom the decision was given. Both City and United States in this case considered the decision as against them, and both gave notice of their intention to appeal. The appeal of the United States was, however, on notice of the Attorney-General and the stipulation of the district attorney, dismissed, and the city alone prosecuted its appeal. While the appeal was thus pending in the District Court, Congress passed an

act* by virtue of which the case became transferred to the Circuit Court of the United States. That court, in May, 1865, confirmed the claim of the city to the four leagues, excepting, among others, such parcels of land as had been previously "reserved or dedicated to public uses by the United States;" meaning by this, the tracts reserved as above mentioned by the then President, Mr. Fillmore. From this decree of the Circuit Court, the United States appealed to the Supreme Court at Washington.

After the appeal taken (but previous to the trial in the present case), Congress relinquished all right of the United States to land situated within the city of San Francisco, and confirmed to it by the decree just mentioned, to the city, and confirmed the city's claim; subject, however, to the reservations and exceptions designated in that decree,† and also subject to certain specified trusts. The appeal of the United States to the Supreme Court was accordingly dismissed.

On the trial of the present case the plaintiff objected to the admission of the evidence of the first reservation of the President, on account of its indefiniteness of description, and because the President could not make a reservation out of pueblo lands; and of the second one among other reasons because it was the result of a *compromise* between the government and an adverse claimant.

He objected also, to the admission of the decree mentioned as having been made in the Circuit Court, it being admitted on the other side that an appeal was taken to it by the United States and was still pending.

The objections were all overruled; and judgment having been given for the defendant, the case was now here on error.

The case, it will be seen, involved essentially the question of the nature of the title and ownership of lands held by Mexican pueblos under the laws of Mexico in force in Cal-

---

* Act of 1st July, 1864; 13 Stat. at Large, 332.
† Act of March 8th, 1866; 14 Stat. at Large, 4.

ifornia, at the date of the conquest of that country, and, to some extent, of the nature of a pueblo itself.

*Messrs. Cushing, Cole, and Reverdy Johnson, for the plaintiff in error,* contended that, at the time of and long before the American occupation, San Francisco was an organized pueblo; that as such she was by the Mexican law proprietor in fee of four square leagues of land; that the limits of the land were certain; that the title was not an inchoate or imperfect title, but that the entire fee and use—the dominion both direct and useful—was in the pueblo; a matter on which they cited the *Partidas* and other Spanish authorities; that being private property, the President had no power to make a reservation out of it; that the fourteenth section of the act of March 3d, 1851, was a recognition by the United States of the pre-existing title of the city, and estopped them from pretending to title after that; that the decree of the Circuit Court of the United States in the case of *United States* v. *The City of San Francisco,* was not admissible in evidence, an appeal having been taken therefrom, which destroyed its effect as evidence of title; that the decree entered by consent in the United States District Court, on motion of the United States District Attorney, that the United States would not prosecute an appeal from the decree of the board of land commissioners, and that the city should have leave to proceed upon that decree as upon a final decree, was a final adjudication of the title to the land embraced within it, and vested the title absolutely in the city.

*Mr. Stanbery, A. G., and Mr. Lake, contra.*

Mr. Justice FIELD delivered the opinion of the court.

The premises, for the possession of which this action is brought, are situated within the city of San Francisco, in the State of California. The plaintiff claims to be seized in fee of them, and derives his title from the city of San Francisco under an ordinance of the common council for the settlement of land titles in the city, passed on the 20th of June, 1855, commonly known as the Van Ness ordinance, and the

act of the legislature of the State ratifying and confirming the same.

The defendant is an officer in the army of the United States, commanding the military department of California, and as such officer entered upon the possession of the premises previous to the commencement of this action, and has ever since held them under the order of the Secretary of War, as part of the public property of the United States reserved for military purposes.

At the time the ordinance named was passed the city of San Francisco asserted title, as successor of a Mexican pueblo in existence on the acquisition of the country, to four square leagues of land, embracing the site of the present city, and had presented her claim for the same to the board of land commissioners created under the act of March 3d, 1851, and the board had confirmed the claim to a portion of the land, including the premises in question, and rejected her claim for the residue. Dissatisfied with the limitation of her claim, the city prosecuted an appeal from the decision of the board to the United States District Court, and this appeal was then pending and undetermined. By the second section of the ordinance the city relinquished and granted all the title and claim, which she thus held to the land within her corporate limits, as defined by the charter of 1851, with certain exceptions, to the parties in the actual possession thereof, by themselves or tenants, on or before the 1st of January, 1855, provided such possession was continued up to the time of the introduction of the ordinance into the common council, or if interrupted by an intruder or trespasser, had been or might be recovered by legal process. In March, 1858, the legislature of the State ratified and confirmed this ordinance. The party, through whom the plaintiff traces his title, was in such actual possession of the premises in controversy both at the time designated by the ordinance and also on the passage of the confirmatory act of the legislature, and therefore acquired whatever right or title the city possessed; and he improved and cultivated the premises, and erected a building thereon, which was occupied by the

plaintiff as his residence when he was ousted by the defendant.

On the other hand, the authorities of the United States, at the date of the ordinance, and long previous to that date, claimed the right to hold the premises as property of the United States, and as being a portion of a tract set apart for public purposes. As early as the 5th of November, 1850, President Fillmore made an order that certain parcels of land situated "on the bay of San Francisco," should be exempted and reserved from sale for such purposes. Notice of this order was soon afterwards communicated to the commissioner of the general land office, and in June following was transmitted by him to the surveyor-general of the United States for California, in whose office it has ever since remained on file.

On the 31st of December, 1851, this order was modified by the President in some particulars, and the first parcel reserved, or supposed to have been reserved by it, was divided into two separate tracts, each of which was described with precision. We do not deem it, therefore, of any consequence whether the description of the first parcel in the original order was defective and indefinite, as contended by counsel, or whether or not it included the premises in controversy. Nor is it of any consequence that the modification was made, as asserted, to avoid a possible contest with an adverse claimant to a portion of the original reservation. The reasons which may have governed the President cannot affect the validity of his action. He possessed the same authority in 1851 to modify the reservation of 1850, by enlarging or reducing it, that he possessed to make the reservation in the first instance. It is sufficient, in the view we take of this case, that one of the tracts described in the last order embraces the premises in controversy.

The question presented for determination is, therefore, between the title of the city of San Francisco, as it existed on the 1st day of January, 1855, and the title on that day of the United States.

It must be conceded that there was a pueblo of some kind

at the site of the city of San Francisco upon the conquest of the country by the United States on the 7th of July, 1846. We say a pueblo *of some kind*, for the term, which answers generally to the English word *town*, may designate a collection of individuals residing at a particular place, a settlement or a village, or may be applied to a regular organized municipality. The historical evidence, to which we have been directed in the argument, shows that there was a pueblo at that site under the government of an ayuntamiento, composed of an alcalde, regidores, and other officers, as early as 1835, and that it continued in existence for some years under that government, and subsequently until, and for some time after the conquest, under the government of justices of the peace or alcaldes.

It must be conceded, also, that the pueblo, which thus existed, possessed some claim legal, or equitable to, or some interest in lands within the limits of four square leagues, to be assigned and measured off from the northern portion of the peninsula, upon which the city of San Francisco is situated, and that the city has succeeded to such claim or interest. This has been held by the Supreme Court of the State after the most elaborate and extended consideration. But what is of more consequence, and is conclusive upon this court, it has been so adjudged by the Circuit Court of the United States, and that adjudication has been made final, as we shall hereafter see, by the legislation of Congress, and the dismissal of the appeal to this court, which followed that legislation.

By the laws of Mexico, which prevailed in California at the date of the conquest, pueblos or towns, when once established and officially recognized, were entitled, for their benefit and the benefit of their inhabitants, to the use of lands, embracing the site of such pueblos or towns, and of adjoining lands within certain prescribed limits. This right, as we observed in *Townsend* v. *Greeley*,* appears to have been common to the cities and towns of Spain from an early period in her history, and was recognized in the laws and ordi-

---

* 5 Wallace, 336.

nances for the settlement and government of her colonies on this continent. The same general system of laws for the establishment and government of pueblos, and the assignment to them of lands that prevailed under Spain, was continued in Mexico, with but little variation, after her separation from the mother country. These laws provided for the assignment to the pueblos, for their use and the use of their inhabitants, of land not exceeding in extent four square leagues. Such assignment was to be made by the public authorities of the government upon the original establishment of the pueblo, or afterwards upon the petition of its officers or inhabitants; and the land was to be measured off in a square or prolonged form, according to the nature and condition of the country. All lands within the general limits stated, which had previously become private property, or were required for public purposes, were reserved and excepted from the assignment.

Until the lands were thus definitely assigned and measured off, the right or claim of the pueblo was an imperfect one. It was a right which the government might refuse to recognize at all, or might recognize in a qualified form; it might be burdened with conditions, and it might be restricted to less limits than the four square leagues, which was the usual quantity assigned. Even after the assignment the interest acquired by the pueblo was far from being an indefeasible estate such as is known to our laws. The purposes to be accomplished by the creation of pueblos did not require their possession of the fee. The interest, as we had occasion to observe in the case already cited, amounted to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasture lands, or as a source of revenue, or for other public purposes. And this limited right of disposition and use was in all particulars subject to the control of the government of the country.

It is not pretended that any assignment of lands was ever made to the pueblo of San Francisco under the former government. Her claim or right to any lands being therefore

an imperfect one, required the recognition and action of the new government before it could be turned into an absolute and indefeasible estate. Nor did it any the less require such recognition and action by reason of the presumption raised by the fourteenth section of the act of March 3d, 1851, of a grant of land to a city, town, or village, which was proved to have been in existence on the 7th of July, 1846. That section does not specify the extent of the grant which, for the purpose of determining the claim of the lot-holders, and of the city, was to be presumed to have been made; nor does it furnish any measure by which the limits of such grant could be fixed. The claim of the city had, therefore, as the law then stood, to undergo judicial investigation before the board of land commissioners created under the act of March 3d, 1851, and to depend for its validity and extent upon the determination of the board, and of the tribunals of the United States to which it could be carried. The authorities of the city so regarded the claim, and by their direction it was presented to the board in July, 1852. In December, 1854, the board confirmed the claim, as we have already stated, to a portion of the four square leagues, embracing the premises in suit, and rejected it for the residue. From the decision an appeal was taken by the filing of a transcript of the proceedings and decision of the board with the clerk of the District Court. The appeal was by statute for the benefit of the party against whom the decision was rendered; in this case of both parties—of the United States, which contested the entire claim, and of the city, which asserted a claim to a greater quantity than that confirmed—and both parties gave notice of their intention to prosecute the appeal. Subsequently, in February, 1857, the Attorney-General withdrew the appeal on the part of the United States, and in March following, the District Court, upon the stipulation of the district attorney, ordered that appeal to be dismissed, and gave leave to the city to proceed upon the decree of the board as upon a final decree. The counsel of the plaintiff contend that this decree closed the controversy between the city and the United States as to the lands to which the claim was con-

firmed.   But in this view they are mistaken.   Had the city accepted the leave granted, withdrawn her appeal, and proceeded under the decree as final, such result would have followed.   But this course she declined to take.   She continued the appeal for the residue of her claim to the four square leagues.   This kept open the whole issue with the United States.   The proceeding in the District Court, though called in the statute an appeal, was not in fact such.   It was essentially an original suit, in which new evidence was given and in which the entire case was open.   That this was the character of the proceeding in the District Court follows from the decision in the case of *United States* v. *Ritchie.**   In that case it was contended that the act of Congress, in prescribing an appeal from the board of commissioners to the District Court, was unconstitutional, as the board was not a court under the Constitution, and could not be invested with any portion of the judicial power conferred upon the general government; but this court—Mr. Justice Nelson delivering the opinion— held that the suit was to be regarded as an original proceeding, and that the removal of the transcript papers and evidence into it from the board of commissioners was the mode provided for its institution in that court.

" The transfer, it is true," said the court, " is called an appeal.   We must not, however, be misled by a name, but look to the substance and intent of the proceeding.   The District Court is not confined to a mere re-examination of the case as heard and decided by the board of commissioners, but hears the case *de novo* upon the papers and testimony which had been used before the board, they being made evidence in the District Court, and also upon such further evidence as either party may see fit to produce."

The dismissal of the appeal on the part of the United States did not, therefore, preclude the government from the introduction of new evidence in the District Court, or bind it to the terms of the original decree.

The authorities cited by counsel to show that when only

---

\* 17 Howard, 533.

one party appeals from a decree in a California land case, the other party cannot urge objections to the decree, or insist upon its modification, have no application. They are adjudications made in cases of appeal from the District Court to the Supreme Court, where the case is heard on the record from the court below, and where error upon the record alleged by the appellant is alone considered, or in cases where an attempt has been made upon supplementary proceedings on a survey of the land confirmed to deviate from the terms of the original decree. Thus, in *Malarin* v. *United States*,* the District Court had affirmed the validity of the grant to the claimant, but had limited it to one square league. The claimant insisted that he was entitled under the grant to a confirmation of two square leagues, and therefore prosecuted an appeal. The United States were satisfied with the decree and did not appeal. The case, therefore, necessarily stood in this court upon the simple question whether the confirmation should have been for one or for two leagues; and the court said, that as the government had declined to appeal, the validity of the grant was not open for consideration. There is no analogy between this case and the so-called appeal from the board of commissioners to the District Court, which is only a mode, as we have said, for the institution of a new suit in that court.

In the case of *United States* v. *Halleck*,† the decree of the board of commissioners described the land confirmed by specific boundaries. This decree became final by the withdrawal by the United States of the appeal taken on their behalf. But in the survey of the land an attempt was made to change the meaning of the language of the decree, by showing that the commissioners were ignorant of the course and direction of the American River, one of the boundaries prescribed, and, therefore, intended different lines from those specifically declared. To this the court said, that the decree was a finality, not only on the question of title, but as to the boundaries which it specified; that if it were erroneous in

---

* 1 Wallace, 282.                    † 1 Wallace, 439.

either particular the remedy was by appeal; but that the appeal having been withdrawn by the government, the question of its correctness was forever closed. In other words, the court held that a decree which had become final, could not be disregarded or deviated from in the subsequent proceedings taken for its execution. Between the doctrine here asserted and the doctrine contended for by the counsel of the plaintiff there is no analogy.

The case of the city remained in the District Court on her appeal until 1864. On the 1st of July of that year, Congress passed an act "to expedite the settlement of titles to land in the State of California." By the fourth section of this act the District Courts of California were authorized to transfer cases for the determination of claims to land under the act of March 3d, 1851, pending before them on appeal, to the Circuit Court of the United States, when they affected the titles of lands within the corporate limits of any city or town. Under this act, the District Court, in September following, transferred the city case to the Circuit Court, and in October, that court confirmed the claim of the city to four square leagues, subject to certain exceptions, among which were all such parcels of land as had been previously "reserved or dedicated to public uses by the United States." The decree upon this adjudication was finally settled and entered on the 18th of May, 1865. An appeal from it was taken by the United States to the Supreme Court; and the pendency of this appeal was made the ground of objection to the admissibility of the decree when it was offered in evidence. The appeal, it was contended, suspended the operation of the decree and took from it all efficacy as evidence of title. Such undoubtedly is the general effect of an appeal in these land cases; that is to say, the decrees rendered by the District Court cannot support the title of the confirmees or of parties claiming under them pending appeals therefrom, when by the judgment of the appellate court the claims of the confirmees in the premises in controversy may be defeated. But in this case no such result could have followed from any judgment of the Supreme Court. The objection

of the plaintiff was prompted by the fact that the defendant contended, and, as we shall show, contended correctly, that the lands reserved by the decree from the confirmation to the city included the premises in controversy. Assuming that to have been the fact, the judgment of the Supreme Court could not have affected in any respect the title of the plaintiff. That court would have heard the case upon the record, and if it had not affirmed the decree, would have reversed it, or have modified it only in the particulars in which error was alleged by the appellant. A judgment in favor of the United States could only have had the effect either of defeating the entire claim of the city or of restricting its extent in a still greater degree: it could not have removed the exception made in it of the lands reserved for public uses.

But there is another and conclusive answer to the objection to the admissibility of the decree. By the action of Congress it had become, with some modifications, final. On the 8th of March, 1866, which was previous to the trial of this action, Congress passed an act "to quiet the title to certain lands within the corporate limits of the city of San Francisco."* By this act all the right and title of the United States to the land situated within the corporate limits of San Francisco, confirmed to the city by the decree of the Circuit Court, were relinquished and granted to the city, and the claim of the city was confirmed, subject, however, to the reservations and exceptions designated in the decree, and upon the trust that all the land, not previously granted to the city, should be disposed of and conveyed by the city to parties in the *bona fide* actual possession thereof, by themselves or tenants, on the passage of the act, in such quantities and upon such terms and conditions as the legislature of the State of California might prescribe, except such parcels thereof as might be reserved and set apart by ordinance of the city for public uses.

By this act the government has expressed its precise will with respect to the claim of the city of San Francisco to her

---

* Statutes of 1865–6, p. 4.

lands, as it was then recognized by the Circuit Court of the United States. In the execution of its treaty obligations with respect to property claimed under Mexican laws, the government may adopt such modes of procedure as it may deem expedient. It may act by legislation directly upon the claims preferred, or it may provide a special board for their determination, or it may require their submission to the ordinary tribunals. It is the sole judge of the propriety of the mode, and having the plenary power of confirmation it may annex any conditions to the confirmation of a claim resting upon an imperfect right, which it may choose. It may declare the action of the special board final; it may make it subject to appeal; it may require the appeal to go through one or more courts, and it may arrest the action of board or courts at any stage.

The act of March 3d, 1851, is a general act applying to all cases, but the act of March 8th, 1866, referring specially to the confirmation of the claim to lands in San Francisco, withdrew that claim, as it then stood, from further consideration of the courts under the provisions of the general act. It disposed of the city claim, and determined the conditions upon which it should be recognized and confirmed. The title of the city, therefore, rests upon the decree of the Circuit Court as modified by the act of Congress. The subsequent dismissal of the appeal, referred to in the case of *Townsend* v. *Greeley*,\* though made upon consent of parties, necessarily followed.

The decree thus modified excepts from confirmation to the city, as we have already observed, such parcels of land as had been previously "reserved or dedicated to public uses by the United States." By the parcels thus named, reference is had to the tracts reserved by the orders of President Fillmore. One of these tracts, as we have said, contains the premises in controversy. The decree therefore settles the title to them against the plaintiff. Whoever obtained conveyances from the city, or asserted title under the

---

\* 5 Wallace, 337.

Van Ness ordinance, whilst the claim of the city to the land thus conveyed, or to which title was thus asserted, was pending before the tribunals of the United States, necessarily took whatever they acquired subject to the final determination of the claim. Their title stood or fell with the claim, for the decree took effect by relation as of the day when the petition of the city was presented to the board of land commissioners. It is to be treated in legal effect as if entered on that day.*

It only remains to notice the objection taken to the authority of the President to make the reservations in question. The objection is twofold—first, that the lands reserved did not constitute any part of the public domain, but were the property of the city, and were not therefore the subject of appropriation, by order of the President, for public purposes; and second, if they did constitute a part of the public domain, they could only be reserved from sale and set apart for public purposes under the direct sanction of an act of Congress.

The first objection has been sufficiently answered in considering the nature of the claim of the city. It was not a claim to a tract which had been specifically defined; it was a claim only to a specific quantity, embracing, it is true, the site of the pueblo and adjoining lands, but which had yet to receive its precise limits and bounds from the officers of the government. Until this was done, the government was not precluded from setting apart and appropriating any portions of the lands claimed, which might be necessary for public uses. Until then the claim of the city was subservient to the right of the government in this respect.

On the other hand, if the lands were at the time a part of the public domain, as they must be considered to be, because they have been excluded from the lands confirmed to the city in satisfaction of the claim, it is of no consequence to the plaintiff whether or not the President possessed sufficient authority to make the reservations in question. It is enough

---

* Landes v. Brant, 10 Howard, 373.

that the title had not passed to the plaintiff, but remained in the United States. But further than this: from an early period in the history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses.

The authority of the President in this respect is recognized in numerous acts of Congress. Thus, in the Preemption Act of May 29th, 1830, it is provided that the right of pre-emption contemplated by the act shall not "extend to any land which is reserved from sale by act of Congress, or *by order of the President*, or which may have been appropriated for any purpose whatever."\* Again, in the Preemption Act of September 4th, 1841, "Lands included in any reservation by any treaty, law, *or proclamation of the President* of the United States, or reserved for salines or for other purposes," are exempted from entry under the act.† So by the act of March 3d, 1853, providing for the survey of the public lands in California, and extending the pre-emption system to them, it is declared that all public lands in that State shall be subject to pre-emption, and offered at public sale, with certain specific exceptions, and among others " of lands appropriated under the authority of this act, or *reserved by competent authority*."‡ The provisions in the acts of 1830 and 1841 show very clearly that by "competent authority," is meant the authority of the President, and officers acting under his direction.§

The action of the President in making the reservations in question was indirectly approved by the legislation of Congress in appropriating moneys for the construction of fortifications and other public works upon them. The reservations made at the same time embraced seven distinct tracts of land, and upon several of them extensive and costly fortifications and barracks and other public buildings have been erected.

---

\* 4 Stat. at Large, 421.      † 5 Id. 456.      ‡ 10 Id '46.

§ Wolcott *v.* Des Moines Co., 5 Wallace, 688.

But it is sufficient, as we have already said, that the lands remained the property of the United States, whether or not they were by sufficient authority appropriated to public uses.

JUDGMENT AFFIRMED.