## APIS et al. v. UNITED STATES

(District Court. S. D. California. February 21, 1898.)

### No. 846.

1. GRANT OF LANDS UNDER JUDICIAL INVESTIGATION—POWER OF CONGRESS.
   Act Jan. 12, 1891, and the patent issued in pursuance thereto, granting to the Mission Indians a portion of the lands embraced within the Mexican grant, "La Jolla Rancho," are valid, and withdrew the lands so granted from the operation of Act Jan. 28, 1879, permitting the legal representatives, successors, or assigns of José and Pablo Apis to litigate in the United States district court of California their claim to such lands.

2. MEXICAN LAND GRANT—RIGHTS GRANTED BY SPECIAL ACT—REVOCATION.
   The permission accorded the legal representatives, successors, or assigns of José and Pablo Apis, by Act Jan. 28, 1879, to litigate their claim and title to "La Jolla Rancho" in the United States district court of California, was a gratuity on the part of the United States, and revocable at any time before final decree in such proceedings.

3. TITLE TO LANDS IN MEXICAN GRANT — SPECIAL ACT — ADVERSE CLAIMS — BURDEN OF PROOF.
   Act Jan. 28, 1879, permitting the legal representatives, successors, or assigns of José and Pablo Apis to litigate their claim to "La Jolla Rancho" in California, provides, inter alia, that no lands shall be confirmed to said claimants to which there are valid adverse claims under any laws of the United States; that, before filing their claims, such claimants shall execute releases to persons in possession of any portion thereof under valid claim; and that the court, before rendering a decree of confirmation, shall ascertain that said releases have been duly executed. Held, that when such claimants fail to affirmatively show that no part of the land claimed by them was possessed by persons having valid claims thereto January 28, 1879, or, if so held, that claimants had, before bringing their suit, executed valid releases to such persons, their claim must be rejected.

Byron Waters and Max Loewenthal, for plaintiffs.

Frank P. Flint, U. S. Atty., and James R. Finlayson, Asst. U. S. Atty.

WELLBORN, District Judge. This action was instituted by plaintiffs, as heirs at law of José and Pablo Apis, against the United States, under a special act of congress approved January 28, 1879, as follows:

"An act for the adjudication of title to lands claimed by José and Pablo Apis, in the state of California.

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that the legal representatives, suc-

cessors, or assignees of José and Pablo Apis, or either of them, be, and they are hereby, permitted to file their claim and title to a certain tract of land in California known as 'La Iolla Rancho,' in and before the United States district court of California; and that said court shall have the same jurisdiction in all things, to be exercised originally to hear and determine upon the said claim and title, to confirm or reject the same, as the several district courts had, under the act of congress of March third, eighteen hundred and fifty-one, and acts amendatory thereunto. And the supreme court of the United States shall have jurisdiction to hear and determine said cause, upon appeal, as decided in said acts: provided, that no lands shall be confirmed to said claimants by said decree to which there are valid claims existing under the pre-emption, homestead or other laws of the United States at the date of the passage of this act; nor shall any decree of confirmation affect any valid adverse right of any other person or persons, or give to the confirmees, or any of them, any claim upon the United States for compensation for any land such confirmees may lose by reason of pre-emption or homestead claims or adverse rights as aforesaid; and that no decree shall be rendered for more than two square leagues: provided, further, that said claimants before filing their claim and title, shall execute releases to any persons who may be in possession of any portion of said lands under valid claims under the pre-emption, homestead or other laws of the United States at the date of the passage of this act, to the portions of said lands so held respectively, and, before rendering a decree in confirmation the said court shall ascertain that said releases have been duly executed."
20 Stat. 593.

The petition was filed July 22, 1884, and the case transferred from the Northern to the Southern district of California, February 24, 1896. Plaintiffs' claim rests upon a Mexican grant, made November 7, 1845, by Pio Pico, governor of California. The genuineness and due execution of the grant are satisfactorily established. The grant on its face shows, among other things, that Indians were established on, and occupying, some of the lands at the date of the grant, and provides that the grant is made without prejudice to such Indians. Plaintiffs have not shown, nor undertaken to show, that Indians are not now in the occupancy of some of the lands; nor have they shown, nor undertaken to show, what particular lands Indians do occupy. The evidence, however, does show affirmatively that one, at least, of the Indians who were upon said lands at the date of the grant to plaintiffs, were occupying them as late as two or three years ago; and the map introduced by plaintiffs also shows an Indian village on said lands. That Indians were in possession of some of these lands in 1845 appears, as already stated, on the face of the expediente itself. In his report upon the petition of the claimants, Arguello, the prefect, states that the land is "occupied with some small summer crops and a few fruit trees that they have there in their style some natives, for which reason, if the petitioners will engage themselves not to molest them, there is no obstacle against granting their petition." The concession of Gov. Pico declares "that the grantees shall not molest the Indians that will have previously established their residence there, and occupied some small tracts of land." And the formal grant declares: "But they shall not in any manner molest the Indians who are at present established in it, and occupy some lands that they can go on cultivating and possessing notwithstanding this grant."

One of plaintiffs' witnesses, H. G. Stephens, testified that some of the sections claimed by plaintiffs, and which the witness specified, were included within an Indian reservation, created by an executive

order, December 27, 1875. That order, so far as material here, was as follows:

"Executive Mansion, December 27th, 1875.

"It is hereby ordered that the following described lands, in the county of San Diego, California, viz. [San Bernardino Base and Meridian], including Rincon, Gapich, and La Jova Potrero:

"T. 10 S., R. 1 E.

"Sections 16, 23, 25, 26, 30, 31, 32, 33, 34, 35, 36, and fractional sections 17, 18, 19, 20, 21, 22, 27, 28, and 29. * * *

—Be, and the same are hereby, withdrawn from sale, and set apart as reservations for the permanent use and occupancy of the Mission Indians, in Lower California.                                                                    U. S. Grant."

Although said order was not introduced in evidence, the court takes judicial notice of it. Jenkins v. Collard, 145 U. S. 546, 12 Sup. Ct. 868; Jones v. U. S., 137 U. S. 202, 11 Sup. Ct. 80; Caha v. U. S., 152 U. S. 211, 14 Sup. Ct. 513; Code Civ. Proc. Cal. § 1875, subd. 3. Of the sections reserved by that part of the order above quoted, sections 16 and 23, and parts of sections 17, 21, 22, 25, 26, 27, 34, and 35, are included in the lands claimed by plaintiffs.

On January 12, 1891, congress passed an act entitled "An act for the relief of the Mission Indians in the state of California" (26 Stat. 712), which contains, among others, the following provisions:

"That immediately after the passage of this act the secretary of the interior shall appoint three disinterested persons as commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the state of California, upon reservations which shall be secured to them as hereinafter provided.

"Sec. 2. That it shall be the duty of said commissioners to select a reservation for each band or village of the Mission Indians residing within said state, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the president and secretary of the interior. * * * In cases where the Indians are now in occupation of lands within the limits of confirmed private grants, the commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed. * * *

"Sec. 3. That the commissioners, upon the completion of their duties, shall report the result to the secretary of the interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the commission and approved by him in favor of each band or village of Indians occupying any such reservation, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus patented, subject to the provisions of section four of this act, for the period of twenty-five years, in trust, for the sole use and benefit of the band or village to which it is issued, and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village, discharged of said trust, and free of all charge or incumbrance whatsoever."

On December 29, 1891, by executive order, and pursuant to the aforesaid act of congress of January 12, 1891, all the sections embraced in the executive order of December 27, 1875, except section 16, were reserved for Mission Indians. These sections, as already stated, are parts of the land claimed by plaintiffs.

On the 13th day of September, 1892, the following patent was issued:

FEDERAL REPORTER.

"The United States of America.

"To All to Whom These Presents shall Come—Greeting:

"Whereas, it is provided by the act of congress entitled 'An act for the relief of the Mission Indians in the state of California,' approved January twelfth, Anno Domini one thousand eight hundred and ninety-one (26 Stat. 712), that 'the secretary of the interior shall appoint three disinterested persons as commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the state of California, upon reservations which shall be secured to them. * * *

" 'Sec. 2. That it shall be the duty of said commissioners to select a reservation for each band or village of the Mission Indians residing within said state, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the president and secretary of the interior. * * *

" 'Sec. 3. That the commissioners, upon the completion of their duties, shall report the result to the secretary of the interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the commission and approved by him in favor of each band or village of Indians occupying any such reservation, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus patented, subject to the provisions of section four of this act, for the period of twenty-five years, in trust, for the sole use and benefit of the band or village to which it is issued, and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village, discharged of said trust, and free of all charges or incumbrance whatsoever.'

"And whereas, it appears by a copy of a letter dated August 30, 1892, from the acting commissioner of Indian affairs, to the secretary of the interior on file in the general land office, that a selection has been made by the commissioners appointed and acting under said act of congress of January 12, 1891, for the La Piche and La Jolla bands or villages of Mission Indians in California, and such other Mission Indians as are now, or may hereafter become, legal residents thereof, covering fractional sections seventeen, nineteen, twenty, twenty-one, twenty-two, twenty-seven, twenty-eight, and twenty-nine, and sections twenty-three, twenty-five, twenty-six, thirty, thirty-one, thirty-two, thirty-three, thirty-four, and thirty-five, in township ten south, of range one east, of the San Bernardino Meridian, in the state of California, said tracts being (including fractional section eighteen) designated upon the official plat of survey of township ten south, range one east, San Bernardino Meridian, approved March 25, 1885, by W. H. Brown, United States surveyor general for California, as 'Lot No. 39 Potrero Indian Reservation,' and containing an estimated area of (excluding said fractional section eighteen) eight thousand three hundred and twenty-nine acres and twelve-hundredths of an acre:

"Now, know ye, that the United States of America, in consideration of the premises and in accordance with the provisions of the third section of the said act of congress approved January 12, 1891, hereby declares that it does and will hold the said tracts of land selected as aforesaid (subject to all the restrictions and conditions contained in the said act of congress of January 12, 1891) for the period of twenty-five years, in trust for the sole use and benefit of the said La Piche and La Jolla bands or villages of Mission Indians in California, and such other Mission Indians as are now or may hereafter become legal residents thereof, according to the laws of California; and at the expiration of said period the United States will convey the same or the remaining portion not patented to individuals by patent to said La Piche and La Jolla bands or villages of Mission Indians in California, and such other Mission Indians as are now or may hereafter become legal residents thereof, as aforesaid, in fee discharged of said trust, and free of all charge or incumbrance whatsoever: provided, that when patents are issued under the fifth section of said act of January 12, 1891, in favor of individual Indians, for lands covered by this patent, they will override (to the extent of the land covered thereby) this patent, and will separate the individual allotment from

the lands held in common; and there is reserved from the lands hereby held in trust for said La Piche and La Jolla bands or villages of Mission Indians in California, and such other Mission Indians as are now or may hereafter become legal residents thereof, a right of way thereon for ditches or canals constructed by the authority of the United States.

"In testimony whereof, I, Benjamin Harrison, president of the United States of America, have caused these letters to be made patent, and the seal of the general land office to be hereunto affixed.

"Given under my hand, at the city of Washington, this thirteenth day of September, in the year of our Lord one thousand eight hundred and ninety-two, and of the Independence of the United States the one hundred and seventeenth.

"By the President. Benjamin Harrison.
"[Seal U. S. General Land Office.] By E. Macfarland, Asst. Secretary."

Recorded in the general land office, by D. P. Roberts, recorder thereof, in Vol. 20, pp. 262 to 265, inclusive.

This document, like the executive order of December 27, 1875, is a matter of which the court takes judicial notice. The lands described in said document are embraced in the executive orders before mentioned.

Besides the brief filed by the United States district attorney on behalf of the government, Messrs. Shirley C. Ward and Frank D. Lewis, as amici curiæ, have also submitted a brief in the case. Among the grounds of opposition to plaintiffs' claim urged in these briefs are the following: First, that the government, by the act of congress of January 12, 1891, and the patent issued pursuant thereto, granting to the Mission Indians a large portion of the lands claimed by plaintiffs, withdrew the lands so granted from the operation of the act of January 28, 1879, which authorized the institution of this action by plaintiffs; second, that plaintiffs have not only failed to show affirmatively that at the time of the passage of the act last aforesaid, January 28, 1879, there were no adverse valid claims to any of the lands now in controversy, but, on the contrary, they have shown that Indians were at said date in possession of portions of said lands, with valid claims thereto, under the laws of the United States, and that plaintiffs did not "before filing their claim and title," which was the institution of this action, execute releases to said Indians for the portions of said lands so held by them; third, that plaintiffs' claim is barred by various statutes of limitation; fourth, that, since the institution of this action, plaintiffs have been guilty of such laches as precludes them from a recovery.

If the act of January 12, 1891, and patent issued pursuant thereto, were valid, they, of course, withdrew the lands described in the patent from the operation of the act of January 28, 1879. Plaintiffs, however, assail the validity of the act of 1891, on the ground that congress had no power to make any disposition of said lands, contrary to the provisions of the act of 1879, during the pendency of proceedings authorized by the last-named act; citing Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. 1228; Newhall v. Sanger, 92 U. S. 761; and U. S. v. McLaughlin, 127 U. S. 428, 8 Sup. Ct. 1177. These cases do not support the contention to which they are invoked. In Doolan v. Carr, supra, there was no denial by the court of power in congress to dispose of land embraced within a Mexican claim, under judicial consideration; but the court simply held that such land was not "public land," within

the meaning of the acts of congress making grants to railroads, and was reserved from the granting clause of those statutes. The same is true of the other two cases last above cited, namely, Newhall v. Sanger, and U. S. v. McLaughlin. In the last-mentioned case, the court, referring to the opinion in Newhall v. Sanger, say:

"The opinion, however, examined somewhat at large the grounds on which it should be held that Mexican grants (whether valid or invalid), while under judicial consideration, should be treated as reserved lands. The principal reason was that they were not 'public lands,' in the sense of congressional legislation; those terms being habitually used to describe such lands as are subject to sale or other disposal under general laws. The Pacific Railroad acts of 1862 and 1864 only granted, in aid of the railroads to be constructed under them, 'every alternate section of public land * * * not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed.' The lands comprised in a Mexican grant, it was held, must be regarded, not as 'public lands,' but as 'reserved lands,' because, by the treaty with Mexico, all private property was to be respected. And when the act of March 3, 1851, created a board of commissioners to examine all claims to Mexican grants, the thirteenth section declared 'that all lands the claims to which have been finally rejected by the commissioners in the manner herein provided, or which shall be finally decided to be invalid by the district or supreme court, and all lands the claims to which shall not have been presented to the commissioners within two years after the date of this act, shall be deemed, held, and considered as part of the public domain of the United States (9 Stat. 633)'; implying that until then they were not part of the public domain."

I remark, in passing, that the reference in the above excerpt to treaty obligations has no application to the case at bar, because whatever rights plaintiffs may have originally had under the treaty lapsed long before the passage of the act of 1879.

Recurring to the main question, I repeat that none of the cases cited by plaintiffs deny to congress power of disposition over lands embraced within the boundaries of an unconfirmed Mexican grant, while the supreme court has repeatedly asserted that a clear exercise of the power cannot be restrained or interfered with by the judiciary. Grisar v. McDowell, 6 Wall. 363; Whitney v. Robertson, 124 U. S. 190, 8 Sup. Ct. 456; and Botiller v. Dominguez, 130 U. S. 238, 9 Sup. Ct. 525.

In Grisar v. McDowell, supra, the court says:

"By this act the government has expressed its precise will with respect to the claim of the city of San Francisco to her lands, as it was then recognized by the circuit court of the United States. In the execution of its treaty obligations with respect to property claimed under Mexican laws, the government may adopt such modes of procedure as it may deem expedient. It may act by legislation directly upon the claims preferred, or it may provide a special board for their determination, or it may require their submission to the ordinary tribunals. It is the sole judge of the propriety of the mode, and, having the plenary power of confirmation, it may annex any conditions to the confirmation of a claim resting upon an imperfect right which it may choose. It may declare the action of the special board final; it may make it subject to appeal; it may require the appeal to go through one or more courts; and it may arrest the action of the board or courts at any stage."

In Whitney v. Robertson, supra, the court says:

"In Taylor v. Morton, 2 Curt. 454, 459, Fed. Cas. No. 13,799, this subject was very elaborately considered at the circuit by Mr. Justice Curtis, of this court; and he held that whether a treaty with a foreign sovereign had been violated by him, whether the consideration of a particular stipulation of the

treaty had been voluntarily withdrawn by one party, so that it was no longer obligatory on the other, whether the views and acts of a foreign sovereign had given just occasion to the legislative department of our government to withhold the execution of a promise contained in a treaty, or to act in direct contravention of such premise, were not judicial questions; that the power to determine these matters had not been confided to the judiciary, which has no suitable means to exercise it, but to the executive and legislative departments of our government; and that they belong to diplomacy and legislation, and not to the administration of the laws. And he justly observed, as a necessary consequence of these views, that, if the power to determine these matters is vested in congress, it is wholly immaterial to inquire whether, by the act assailed, it has departed from the treaty or not, or whether such departure was by accident or design, and, if the latter, whether the reasons were good or bad. In these views we fully concur. It follows, therefore, that, when a law is clear in its provisions, its validity cannot be assailed before the courts for want of conformity to stipulations of a previous treaty not already executed. Considerations of that character belong to another department of the government. The duty of the courts is to construe and give effect to the latest expression of the sovereign will. In Head Money Cases, 112 U. S. 580, 5 Sup. Ct. 247, it was objected to an act of congress that it violated provisions contained in treaties with foreign nations; but the court replied that, so far as the provisions of the act were in conflict with any treaty, they must prevail in all the courts of the country; and, after a full and elaborate consideration of the subject, it held that, 'so far as a treaty made by the United States with any foreign nation can be the subject of judicial cognizance in the courts of this country, it is subject to such acts as congress may pass for its enforcement, modification, or repeal.'"

In Botiller v. Dominguez, supra, the court says:

"Two propositions under this statute are presented by counsel in support of the decision of the supreme court of California. The first of these is that the statute itself is invalid, as being in conflict with the provisions of the treaty with Mexico, and violating the protection which was guarantied by it to the property of Mexican citizens owned by them at the date of the treaty, and also in conflict with the rights of property under the constitution and laws of the United States so far as it may affect titles perfected under Mexico. * * * With regard to the first of these propositions it may be said that, so far as the act of congress is in conflict with the treaty with Mexico, that is a matter in which the court is bound to follow the statutory enactments of its own government. If the treaty was violated by this general statute enacted for the purpose of ascertaining the validity of claims derived from the Mexican government, it was a matter of international concern, which the two states must determine by treaty, or by such other means as enables one state to enforce upon another the obligations of a treaty. This court, in a class of cases like the present, has no power to set itself up as the instrumentality for enforcing the provisions of a treaty with a foreign nation which the government of the United States, as a sovereign power, chooses to disregard. The Cherokee Tobacco, 11 Wall. 616; Taylor v. Morton, 2 Curt. 454, Fed. Cas. No. 13,799; Head Money Cases, 112 U. S. 580, 598, 5 Sup. Ct. 247; Whitney v. Robertson, 124 U. S. 190, 195, 8 Sup. Ct. 456."

It should be remembered, however, that the power of congress to dispose of lands embraced within a Mexican claim, while under judicial investigation, pursuant to the general law of March 3, 1851, and protected by treaty stipulation, is not involved in the case at bar. The permission accorded plaintiffs, by the act of 1879, to present their claim for confirmation or rejection, was a gratuity on the part of the United States, revocable at any time before final decree in the proceeding thus authorized.

Plaintiffs further contend that the act of 1879, allowing them to present to this court, for confirmation or rejection, their claim to

La Jolla, is a special act, relating only to their title, and hence not affected by the later act of 1891, which provides generally for allotment of lands to Mission Indians, citing Ex parte Crow Dog, 109 U. S. 570, 3 Sup. Ct. 396; and, further, that, by the act of 1879, La Jolla was appropriated to a particular purpose, and is not within the scope of any subsequent grant by congress, which does not expressly include it, citing Iron Co. v. Cunningham, 155 U. S. 373, 15 Sup. Ct. 103.

It is true that said act does not mention "La Jolla," by name, but it does direct the commissioners to include, as far as practicable, in the contemplated reservation, such lands as had been in the actual possession of the Indians for whom the reservation was to be created. Now, since the commissioners, who are presumed to have done their duty,—i. e. to have followed the directions of the statute under which they were acting,—included a part of La Jolla in the reservation selected by them, it follows, nothing being shown to the contrary, that the Indians had been in the actual possession of the part so selected,— and therefore it was among the lands intended by congress for the proposed reservation. This conclusion is strengthened by the fact that the only lands which the commissioners were not to select are specified in the proviso to section 3 of said act, as follows:

"Provided, that no patent shall embrace any tract or tracts to which existing valid rights have attached in favor of any person under any of the United States laws providing for the disposition of the public domain, unless such person shall acquiesce in and accept the appraisal provided for in the preceding section," etc.

The appraisal provided for in the preceding section is as follows:

"They shall also appraise the value of the improvements belonging to any person to whom valid existing rights have attached under the public-land laws of the United States, or to the assignee of such person, where such improvements are situated within the limits of any reservation selected and defined by said commissioners subject in each case to the approval of the secretary of the interior."

If it be conceded that the act of 1879 was a law "providing for the disposition of the public domain," still, since the privilege accorded plaintiffs by said act was not contractual, as already indicated, it can hardly be contended that any valid rights have yet attached in favor of plaintiffs to La Jolla, or can attach before a final decree of confirmation. Furthermore, it should be observed, in construing the act of 1891, that the cases cited by plaintiffs, and hereinbefore noticed, of Doolan v. Carr, Newhall v. Sanger, and U. S. v. McLaughlin, are inapplicable, for the reason that the words "public lands," which were determinative in said cases, are not employed in the act of 1891 to designate the lands from which the reservations were to be selected.

For the foregoing reasons, I think that plaintiffs' claim, so far as concerns the lands which have been granted to the Mission Indians pursuant to the act of January 12, 1891, must be rejected. There are other reasons, equally as satisfactory, why there should not be a decree of confirmation as to any of the lands embraced in plaintiffs' claim.

The act of January 28, 1879, devolves upon the court a peculiar duty. The genuineness and due execution of the grant are not the only matters submitted to the court's decision. Congress, while recognizing

the possibility that there were adverse claims, did not ascertain and except from the operation of the act such adverse claims, but devolved that duty upon the court, and, as shown by the provisos of said act, was unusually careful to protect all valid claims arising under any laws of the United States. Said provisos require—First, that no lands shall be confirmed to said claimants to which there are valid claims existing under any law of the United States at the date of the passage of the act; second, that a decree of confirmation shall not affect any valid adverse right of any other person or persons, thus leaving open for further consideration the question of the existence of adverse rights, even though the land should be confirmed to the claimants; third, that claimants, before filing their claim and title, shall execute releases to any persons who may be in possession of any portion of said lands, under valid claims, and that, before rendering a decree of confirmation, the court shall ascertain that said releases have been duly executed. This duty the court can discharge only by holding that it is incumbent on plaintiffs to show affirmatively that, at the date of the act, no person was in possession of any part of the land in controversy, under a valid claim under any law of the United States, or, if any person was so in possession, that, before filing their claim and title, plaintiffs released to such person the land so possessed by him. This plaintiffs have failed to do. On the contrary, their evidence shows that, of the Indians who were upon the land in 1845, there was at least one of them occupying the lands as late as two or three years ago. A map introduced in evidence by plaintiffs also shows that there is on a part of the lands in controversy an Indian village. Since the original grant to plaintiffs itself shows that there were residing on these lands at the date of the grant, in 1845, certain Indians, it is not unreasonable to assume, in the absence of proof to the contrary, that the present inhabitants of said Indian village are descendants of the Indians referred to in said grant. This assumption is strengthened by the facts that the act of January 12, 1891, provided that the reservation to be selected by the commissioners for any band of Mission Indians should include, as far as practicable, the lands and villages which had been in the actual occupation of said Indians; and the reservation so selected and patented does include a large part of the lands in controversy. Besides, if the Indians who now inhabit said village are without possessory or other rights, because of their not being descendants of the Indians who occupied said lands in 1845, this is one of the matters which plaintiffs, by the act of 1879, are required to show as a prerequisite to any decree of confirmation.

That the Indians who were thus occupying the land in 1845, and their descendants, then had, and now have, valid rights, has been settled by the supreme court of California (Byrne v. Alas, 74 Cal. 628, 16 Pac. 523); and this interpretation of the law is binding upon the federal courts (Christy v. Pridgeon, 4 Wall. 196). In Byrne v. Alas, supra, it is true that the rights of the Indians were preserved under the patent which was issued on the decree of confirmation. In the case at bar, it is argued by plaintiffs that, since there has been no decree of confirmation nor patent, the rights of the Indians have

lapsed, and that the act of congress of 1879, under which plaintiffs are now proceeding, gives permission only to José and Pablo Apis, and their representatives, to file their claim to the property in controversy. This argument of plaintiffs leaves out of view the executive order of December 27, 1875, which the president was authorized to make (Grisar v. McDowell, 6 Wall. 363, 382), reserving to the Mission Indians certain parts of the land in controversy. When the executive order of December 27, 1875, was issued, the lands in question were a part of the public domain. Section 13 of the act of March 3, 1851, provides:

"That all lands, * * * the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held, and considered as part of the public domain." 9 Stat. 633.

If, therefore, it be conceded that the possessory rights of the Indians lapsed with plaintiffs' original grant, because said grant was not presented to the commissioners under the act of March 3, 1851, still the executive order above mentioned gave, or, in effect, restored to, said Indians their rights of permanent use and occupancy.

Plaintiffs further insist that these possessory rights are not "valid claims," within the meaning of the act of January 28, 1879, for the reason that the reservation created by said executive order was the property of the government solely, and, if the object of the proviso to said act had been the protection of the rights of the government, different phraseology would have been employed. In this view I cannot concur. While the government undoubtedly was interested in the reservation created by said executive order, the substance of that order was a dedication to the Indians of the lands therein described. Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733. Nor was this use of the land "a temporary use," as urged by plaintiffs. On the contrary, it was declared to be, and has since in fact become, a permanent use, through the operation of the subsequent act of January 12, 1891 (26 Stat. 712), and the grant of September 13, 1892, made pursuant to said act.

In the case of Railroad Co. v. Roberts, 152 U. S. 117, 14 Sup. Ct. 498, cited by plaintiffs, the court uses this language:

"And the setting apart, by statute or treaty with them, of lands for their occupancy, is held to be of itself a withdrawal of their character as public lands, and consequently of the lands from sale and pre-emption. * * * As early as 1839 it was held, in Wilcox v. Jackson, 13 Pet. 498, 'that a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace or operate upon it, although no exception be made of it.' The reservation referred to there was of land for military purposes; and in Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733, it was said that this doctrine 'applies with more force to Indian than to military reservations. The latter,' the court observed, 'are the absolute property of the government. In the former other rights are vested. Congress cannot be supposed to grant them in a subsequent law, general in its terms. Specific language, leaving no room for doubt as to the legislative will, is required for such purpose.'"

Again, the supreme court has said:

"That lands dedicated to the use of the Indians should, upon every principle of natural right, be carefully guarded by the government, and saved from a

possible grant, is a proposition which will command universal assent." Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733.

Plaintiffs further claim that the reservation of 1875 was not contractual, and that congress had the power to subject the lands embraced within said reservation to the operation of the act of 1879, under the constitutional provision: "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." Const. U. S. art. 4, § 3, subd. 2. Conceding that congress possessed the power here asserted, still, as I have already shown, the power has not been exercised. Plaintiffs have not only failed to show that no part of the lands they claim were possessed by persons having valid claims thereto under the laws of the United States on January 28, 1879, but, on the contrary, have shown that at said date there were Indians occupying portions of said lands, under valid claims, and no releases of said lands to said Indians have been made by plaintiffs. The act of 1879 expressly provides, as already shown, that such releases shall be executed before plaintiffs file their claim and title, and further requires the court, before rendering any decree of confirmation, to ascertain that said releases have been duly executed. This requirement not having been complied with, plaintiffs' claim must be rejected.

The foregoing views render unnecessary further mention of the other grounds upon which said claim is resisted. A decree conformable to this opinion will be entered.