[No. 11885. In Bank. — January 31, 1888.]

M. BYRNE, RESPONDENT, *v.* ANTONIO ALAS ET AL.,
APPELLANTS.

MISSION OR PUEBLO INDIANS — RIGHT OF OCCUPANCY TO LAND WITHIN
　　MEXICAN GRANT — PRESENTATION OF CLAIM TO LAND COMMISSIONERS.
　　— Mission or Pueblo Indians, who by themselves and their ancestors have
　　been in the continuous use, occupation, and possession of lands included
　　within the exterior limits of a Mexican grant from a time prior to the
　　establishment of the Mexican government, have a right to remain in
　　the occupancy thereof as against the patentee from the United States
　　government and his grantees, notwithstanding they never presented
　　their claim to the lands to the board of land commissioners appointed by
　　the act of Congress of March 3, 1851, to ascertain and settle private land
　　claims in California.

ID. — EFFECT OF PATENT. — Under section 15 of the act of March 3, 1851,
　　the patent issued in pursuance of the decree confirming the Mexican
　　grant was conclusive only as between the United States and the claim-
　　ant, and did not determine the relation between him and the Indians.
　　Under this section, the rights of the Indians were preserved without
　　presenting their claims, and the patentee took the legal title in fee, sub-
　　ject to their right of occupancy.

ID. — EJECTMENT — EVIDENCE OF RIGHT OF OCCUPANCY. — In an action of
　　ejectment by a grantee of the patentee to recover possession of such
　　lands from the Indians, the latter may show that the plaintiff holds the
　　legal title, burdened with their right of occupancy.

APPEAL from a judgment of the Superior Court of San
Diego County.

The facts are stated in the opinion of the court.

*Shirley C. Ward, Special U. S. Attorney for the Mission
Indians,* and *Wicks & Ward,* for Appellants.

By the general laws of Spain and Mexico, lands occu-
pied and possessed by Indians, or lands that were not
vacant, were not subject to grant, and an attempted
grant of such lands availed not as against Indians in
possession. (Hall's Mexican Laws, secs. 38, 40, 48, 159;
Act of Mexican Congress of Aug. 18, 1824; *Leese* v. *Clark,*
3 Cal. 17; Report of William Cary Jones to Secretary of
Interior, dated April 10, 1850.) The Indians have not

forfeited their claims by not presenting them to the board of land commissioners appointed by the act of Congress of March 3, 1851. ( *Wilson* v. *Castro*, 31 Cal. 420; *Hart* v. *Burnett*, 15 Cal. 530; *Fulton* v. *Hanlow*, 20 Cal. 480; *Hardy* v. *Harbin*, 4 Saw. 536; *Townsend* v. *Greeley*, 5 Wall. 335; *Meader* v. *Norton*, 11 Wall. 442; *Carpentier* v. *Montgomery*, 13 Wall. 480.) The patent issued by the government of the United States to the grantor of the plaintiff did not conclude the rights of the Indians to the occupancy of the land in controversy. (Act of March 3, 1851; *Teschemacher* v. *Thompson*, 18 Cal. 11; *Beard* v. *Federy*, 3 Wall. 493; *United States* v. *White*, 23 How. 253; *Boggs* v. *Merced Min. Co.*, 14 Cal. 279; *Stoddard* v. *Chambers*, 8 How. 284; *United States* v. *Arredondo*, 6 Pet. 728; *Reichart* v. *Felps*, 6 Wall. 160; *Best* v. *Polk*, 18 Wall. 112; *Morton* v. *Nebraska*, 21 Wall. 660; *New Orleans* v. *United States*, 10 Pet. 731; *Adams* v. *Norris*, 103 U. S. 593.) The defendants may show their right of occupancy in the present action. (*Cadiz* v. *Majors*, 33 Cal. 288; *Clark* v. *Lockwood*, 21 Cal. 220; *Kenyon* v. *Quinn*, 41 Cal. 325; *Bruck* v. *Tucker*, 42 Cal. 352; *Miller* v. *Fulton*, 47 Cal. 146; *Kentfield* v. *Hayes*, 57 Cal. 409; *Carr* v. *Quigley*, 57 Cal. 395; *McLaughlin* v. *Heid*, 63 Cal. 208; *S. P. R. R.* v. *Garcia*, 64 Cal. 515.)

*A. B. Hotchkiss*, and *Byron Waters*, for Respondent.

The manner, time, and conditions of extinguishing the Indian right of occupancy are exclusively matters for the government, and cannot be interfered with or put in contest by private parties. (*Buttz* v. *N. P. R. R.*, 119 U. S. 55.) The asserted right of occupancy by the defendant does not exist. (*Thompson* v. *Doaksum*, 68 Cal. 594.)

PATERSON, J.—The complaint in this action is in the usual form of ejectment. The defendants—over twenty in number—are Mission or Pueblo Indians, claiming

the land by virtue of their possession, and continuous, open, and exclusive use and occupancy by their predecessors and ancestors ever since the year 1815.

The plaintiff had judgment in the court below upon the following agreed statement of facts: "1. That the premises here in controversy are included within the exterior boundaries of the Mexican grant of the San Jacinto rancho, made December 31, 1842; that said grant was duly confirmed by the United States courts, and that a United States patent issued therefor January 17, 1880; that at the time of the commencement of this action plaintiff held legal title to the premises in controversy as the legal successor of the patentee from the government. 2. That the defendants are Mission or Pueblo Indians; that their ancestors and predecessors have been in the continuous, open, and notorious, peaceable and exclusive, possession, occupancy, and use of the premises in controversy, claiming adversely to all the world ever since and for a long time prior to the establishment of the Mexican republic, to wit, ever since the year A. D. 1815; that the defendants never presented their claim to the land in controversy to the board of land commissioners appointed by the act of Congress, passed March 3, 1851, and entitled 'An act to ascertain and settle the private land claim in the state of California.' It is further agreed that all defense of the statute of limitations is hereby waived on the part of the defendants herein."

1. The questions presented for our consideration upon these facts are difficult and important. The civilized and christianized Indians of the Californias, and indeed of all the Spanish colonies, seem to have been treated as the special and favorite wards of the Spanish sovereigns. Their moral and spiritual welfare and improvement were regarded as matters of great interest to the country, and their personal security, peace, prosperity, and rights of property were most jealously guarded through legis-

lation and by those in authority. In these respects the contrast between the policy of the Spanish and Mexican governments towards their aborigines and that manifested in some of the English colonies during contemporaneous reigns is quite marked. Early in the sixteenth century King Philip commanded that settlements on and apportionments of the new territories should be without damage to the Indians, and " that the farms and lands which shall be given to the Spaniards shall be without prejudice to the Indians, and that those which have been given to their prejudice and damage shall be returned to whom by law they may belong." (2 White's New Recopilacion, 51.) It was made the special duty of local judges to visit the farms of the Indians, without previous request so to do, and ascertain whether the Indians had suffered any injury in person or in property; and if deemed best, after due notice, to remove them to some other place. It was provided that ' the Indians shall be left in possession of their lands, hereditaments, and pastures in such manner as that they shall not stand in need of the necessaries of life." No compositions were admitted of lands which Spaniards had acquired from Indians illegally; and the protectors were commanded to procure all illegal contracts to be annulled.

" The broad field of Spanish jurisprudence bristled all over with fortifications for the protection of the Indians. The government of Spain, while careful of their proprietary rights, expended much for their conversion to Christianity.

" As soon as the Indians became sufficiently pacified, the governors (*adelantados*) were to distribute them among the colonists, who were to take charge of them and watch over their welfare, as provided in book 6 of the *Recopilacion de las Indias*.

" Laws were provided for the founding of Indian pueblos, or towns.

"It is clear from the whole tenor of the Spanish and Mexican laws, whether in the form of pueblos or ranchos, that the Indians are entitled in equity and in good conscience, and even according to the strict rigor of the laws, to all the lands they have, or have had, in actual possession for cultivation, pasture, or habitation, when such domain can be ascertained to have had any tolerably well-defined boundaries. Both Spain and Mexico have acknowledged this principle to be a just one." (Hall's Mexican Laws, secs. 38, 49, 151, 153–155, 159–161; also 1 White's New Recopilacion, 411; 2 White's New Recopilacion, 24, 34, 48, 53, 54, 59, 703.)

At first the Indians were permitted in the presence of the judge to sell their real and personal property at public auction; but in 1781 a decree was published prohibiting the Indians from selling their real estate without license from the proper authority. This remained in force until the independence of Mexico, which made all inhabitants of the Mexican nation equal before the law. The plan of Iguala, adopted in February, 1821 (when the relation between Mexico and Spain ceased, and the sovereignty became vested in the Mexican nation), declared that "all the inhabitants of New Spain, Africans or Indians, are citizens of this monarchy, . . . . and that the person and property of every citizen shall be respected and protected by the government." These principles were reaffirmed by the treaty of August 24, 1821, between the Spanish viceroy and the revolutionary party, and the declaration of independence, issued on the 28th of September, 1821, reaffirmed the principles of said plan.

After the acquisition of California from Mexico, the United States was bound, under the treaty of Guadalupe Hidalgo, to respect and protect all titles, both legal and equitable, acquired previous to the cession; and it devolved upon Congress to prescribe methods and steps necessary to a just, speedy, and effective determination

of the rights of claimants. Much perplexity existed as
to how this was to be accomplished, owing to ignorance
as to the condition of land titles here at that time. In
July, 1849, William Carey Jones was appointed a "con-.
fidential agent of the government, to proceed to Mexico
and California for the purpose of procuring information
as to the condition of land titles in California," to aid,
no doubt, in securing intelligent legislation upon the
subject. His report was made in March, 1850, to the
Secretary of the Interior, who laid the same before Con-
gress. After an extended consideration of this report in
Congress, the act of March 3, 1851, entitled "An act to
ascertain and settle private land claims in the state of
California," was passed. In this report Mr. Jones thus
speaks of the rights of Indians: "I am also instructed
to make an inquiry into the nature of Indian rights [to
the soil] under the Spanish and Mexican governments.
It is a principle constantly laid down in the Spanish
and colonial laws that the Indians shall have a *right* to
such land as they need for their habitations for tillage
and for pasturage. . . . . Special directions were given
for the selection of lands for the Indian villages in
places suitable for agriculture, and having the neces-
sary wood and water. . . . . Agreeably to the theory
and spirit of these laws, the Indians in California were
always supposed to have a certain property or interest
in the missions. . . . . We may say, therefore, that
however maladministration of the law may have de-
stroyed its interest, the law itself has constantly asserted
the rights of the Indians to habitations and sufficient
fields for their support. The law always intended the
Indians of the missions— all of them who remained
there—to have homes upon the mission grounds. The
same, I think, may be said of the large ranchos,—most
or all of which were formerly mission ranchos,—and of
the Indian settlement or *rancherias* upon them. I under-
stand the law to be that whenever Indian settlements are

established and the Indians till the ground, they have a right of occupancy in the land they need and use, and whenever a grant is made which includes such settlements, the grant is subject to such occupancy. This right of occupancy, however, at least when on private estates, is not transferable, but whenever the Indians abandon it the title of the owner becomes perfect. Where there is no private ownership over the settlement, as where the lands it occupies have been assigned it by a functionary of the country thereto authorized, there is a process, as before shown, by which the natives may alien their title. I believe these remarks cover the principles of the Spanish law in regard to Indian settlements, as far as they have been applied in California, and are conformable to the customary law that has prevailed there. The continued observance of this law, and the exercise of the public authority to protect the Indians in their rights under it, cannot, I think, produce any great inconvenience, while a proper regard for long-recognized rights and a proper sympathy for an unfortunate and unhappy race would seem to forbid that it should be abrogated unless for a better. . . . . In the wild or wandering tribes the Spanish law does not recognize any title whatever to the soil."

It was held in *Leese* v. *Clarke*, 3 Cal. 17, that every Mexican grant must be determined and its validity established by the fundamental law of the Mexican congress, passed in 1824, the regulations of 1828, and the ordinances of the departmental legislature consistent therewith. Under these laws and regulations, the territorial governors were authorized to grant—with certain specified exceptions—vacant lands. (Hall's Mexican Laws, 504; *Ferris* v. *Coover*, 10 Cal. 590, note.)

If it be true that under the laws of Mexico only vacant lands could be granted, and that grants were to be without prejudice to Indians, it would seem that the lands in controversy, having been in the undisturbed

possession of defendants and their ancestors ever since 1815, were not subject to grant so as to cut off the right of occupancy; and as it is expressly provided in the grant before us that " he [Estudillo] shall in no way disturb nor molest the Indians who are established or living thereon at the present time," the patentee and his grantee under the law and the terms of the grant took the fee, subject at least to the right of occupancy by the Indians; and those rights are still preserved, unless the Indians forfeited them by failure to present their claims to the board of land commissioners, appointed by the act of March 3, 1851.

The nations of Europe, in whose behalf discoveries and settlements were made on this continent, established among themselves by common consent the principle that discovery gave title to the government by whose subject or authority it was made. The relations between the discovering nations and the natives were matters of regulation, but it became the universal rule, that where the lands were in the actual possession of Indians, the ultimate fee (encumbered with the Indian right of occupancy) should be considered to be in the discovering sovereign, and its successors, with the condition attached that the political power alone—the legislative or executive department — might extinguish the Indian right of occupancy, and leave the fee unencumbered to pass to the grantee or patentee of the government. (*Clark* v. *Smith*, 13 Pet. 195; *Johnson* v. *Mackintosh*, 8 Wheat. 575.) With the question of extinguishment the courts have nothing whatever to do except to inquire whether the right of occupancy has been extinguished by the legislative or executive department. Of course the dominant powers were not *required* to recognize any right in the natives to the soil which the former had acquired by conquest. But while " claiming the right to acquire and dispose of the soil, the discoverers recognized the right of occupancy, — a usufructuary right in the

natives. They accordingly made grants of land occupied by Indians, and these grants were held to convey a title to the grantees, subject only to the Indian right of occupancy." (*Buttz* v. *N. P. R. R. Co.*, 119 U. S. 67; *Butcher* v. *Witherly*, 95 U. S. 517.)

Among all the sovereigns who established a foothold on this continent, none manifested so great an interest in the Indians — so great a solicitude for their welfare and happiness — as the Spaniards. The kings of Spain recognized in the Indian an inferior man committed by Divine Providence to their benevolent charge, and to be elevated by their kindness and instruction to the dignity and condition of a Christian. (2 White's New Recopilacion, 40–48.) Pueblos or settlements were established for them. They were given the right of possession within them. Full provision for this was made prior to 1815, when the ancestors of these defendants took possession, and of course prior to the adoption of the plan of Iguala. Not only is the law for the establishment of the pueblo older than the title of Mexico, but the actual establishment of the Indians in pueblos, and the settlement of the ancestors of the defendants thereon, antedated the succession of Mexico. The Mexican nation was bound to respect the rights of the Indians, for under the plan of Iguala "the person and property of every citizen (African or Indian) shall be respected and protected by the government." And that these rights were respected is apparent from the terms of the grant to Estudillo. ' In the petition of Estudillo to the governor, he promises not to molest the Indian inhabitants; the petition was referred to the prefect for proceedings to be had, inquiring especially as to the wish or desires of the Indians; a return was made that the Indians were "willing that the applicant should settle upon the place, the mentioned Indians offering furthermore that as soon as the land will be occupied those of them who are moving about will get together and live contented; that the land, formerly a part of the

mission of San Luis Rey, is now vacant"; and in the
grant the first condition imposed is that he shall in no
way disturb or molest the Indians who are established
or living thereon. It is provided: " 5. If he contravene
these conditions he will forfeit his right to the land, and
it shall be open to denouncement by another party."

It must be presumed that all these inquiries and con-
ditions were made in accordance with the principles of
existing law, and that the grant in pursuance thereof
protected the possession of the Indians as against the
proprietary ownership of the grantee. There is nothing
in the colonization laws of 1824 or the regulations of
1828 indicative of a purpose by Mexico to depart from
the traditional policy of the Spanish government. This
grant shows that the same old rights were recognized
and adhered to, —the right of Indians to occupy lands
upon which they had been placed, and that the fee should
be granted, if at all, subject to such right of occupancy.
The grant did not annul the rights of the Indians, or
estop them from claiming the same; on the contrary, it
by its terms expressly preserves those rights. From the
examination we have been able to give the Spanish and
Mexican laws, we think that the statement of William
Carey Jones, which we have quoted above, is fully sus-
tained by the authorities. If there has been any act of
the legislative or executive department of either the
Spanish or Mexican government, for the extinguishment
of the usufructuary interest of the defendants or their
ancestors, we have been unable to find any record of it.
The grant, being a part of the Mexican archives, is a pub-
lic document. (*Rhodes* v. *Bell*, 2 How. 405; *Romero* v.
*United States*, 1 Wall. 742.)

2. It becomes necessary to inquire to what extent, if
at all, the confirmation of the Estudillo grant and the
United States patent affected the claim of these defend-
ants. The fifteenth section of the act of March 3, 1851,
provides that the decrees, or any patent issued under

the act, "shall be conclusive between the United States and claimants only, and shall not affect the interests of third persons." Under this clause the rights of the Indians were preserved without presenting their claims. The patentee took the title in fee, subject to the Indian right of occupancy. The rights of the defendants and their ancestors, existing before the change of sovereignty, were preserved to them. The confirmation of the grant to Estudillo was also a confirmation of defendants' rights. Estudillo took all he was entitled to, and no more,—the legal title. That was all the United States could give him. The right which the defendants and their ancestors held, and could have enforced at the time of the treaty of Guadalupe Hildago as against a Mexican grantee, passed to Estudillo in trust for them by the decree of confirmation and the patent. The patent was based upon a Mexican grant. The land never was any part of the public domain of the United States, although held subject to the trust of protecting the interests of claimants under the former sovereign. The patent, therefore, passed the legal title to the patentee, burdened with whatever equities existed at the time of the cession of California, in favor of third persons. Under the treaty the government of the United States stood in the place of the Mexican government. Its patent confirmed the grant, proclaimed it to be good,—neither added to nor detracted from it in any way. It left the title of Estudillo just as it was at the time of the treaty, so far as the Indians were concerned, and it remained thereafter as to them just as it would have remained if the treaty had not been made. If the Indians were entitled to possession before the date of the patent, they were entitled to it afterwards, so long as any of the community remained in actual possession. So far as we have been able to learn, nothing remained for them to do under the laws of Spain or Mexico to complete their rights of possession. Neither was there any act or writing required on the part of the govern-

ment.  Their right was, therefore, complete.  (*Leese* v.
*Clarke*, 3 Cal. 24; *Teschemacher* v. *Thompson*, 18 Cal. 11;
*Boggs* v. *Merced Mining Co.*, 14 Cal. 297; *Waterman* v.
*Smith*, 13 Cal. 415; *Beard* v. *Federy*, 3 Wall. 489.)

Furthermore, section 16 of the act of March 3, 1851,
provides "that it shall be the duty of the commissioners
herein provided for to ascertain and report to the Secre-
tary of the Interior the tenure by which the mission
lands are held; and those held by civilized Indians, and
those who are engaged in agriculture or labor of any
kind; also, those which are occupied and cultivated by
pueblo or rancheros Indians."  This language indicates
that Congress did not intend that the rights of the In-
dians should be cut off by a failure on their part to pre-
sent their claims, but that it should be the duty of the
commissioners to ascertain and report the tenure by
which they held their lands; and this is in harmony
with the suggestions made in that behalf by Mr. Jones.

Inasmuch as the rights of the Indians were valid
rights, existing at the date of the treaty of Guadalupe
Hidalgo,—rights which came to them by virtue of the
laws of Mexico and of Spain,—the patent was conclusive
only as between the United States and the grantee; and
in view of the nature of their claim and the time when
their rights attached, we think they are third persons
within the meaning of section 15 of the act.  (*Tesche-
macher* v. *Thompson*, *Beard* v. *Federy*, *supra*; *United States*
v. *White*, 23 How. 253; *Adam* v. *Norris*, 103 U. S. 593;
*Miller* v. *Dale*, 92 U. S. 473.)

The legal title secured to Estudillo and his grantees
must be held by them charged with the right of occu-
pancy by the defendants.  Where a claim was held sub-
ject to any trust before presentation to the board, the
trust was not discharged by a confirmation and subse-
quent patent.  The confirmation inured to the benefit
of the confirmee only so far as the legal title was con-
cerned.  The confirmation established the legal title in

Estudillo, but did not determine the relation between him and third persons. The trust was not stated, but the legal title was none the less subject to the same trust in the hands of the claimant. (*Townsend* v. *Greeley*, 5 Wall. 335; *Hart* v. *Burnett*, 15 Cal. 530.)

The defendants, under our system of pleadings and practice, are permitted to show in ejectment that the plaintiff holds the legal title, burdened with the Indian right of occupany. (*Fulton* v. *Hanlow*, 20 Cal. 480.)

3. Respondent relies upon the case of *Thompson* v. *Doaksum*, 68 Cal. 594. That case differs from the one at bar in several respects. No claim whatever was ever presented to the board of land commissioners for confirmation. Section 13 of the act of March 3d provided that "all lands the claims to which shall not have been presented to the commissioners within two years after the date of the act shall be deemed, held, and considered as part of the public domain of the United States." The lands claimed by these defendants are within the boundaries of a Mexican grant confirmed by the board of land commissioners to Estudillo, it is true, but, as we have seen, this confirmation relieved the defendants of the necessity of presenting their claims, and conclusively adjudicated the fact that the lands were private property, and no portion of the public domain. The Indians interested in that case were not pueblo or rancheros Indians, and no duty of ascertaining their rights devolved upon the land commission. The Indians therein mentioned were never wards of the government. Furthermore, there was, in that case, a pre-emption claim filed under the land law of the United States, and the patent purported to convey both the legal and the equitable title against the government and against all the world; and of course could not be attacked in a collateral proceeding. The title to the lands in controversy was never in the United States. The patent determined the rights of the government and the patentee, but not the rights of third per-

sons.  If there was anything in the nature of a trust before the claim was presented to the board, that trust was not discharged by the action of the land commissioners, or the officers of the land department.   There is nothing to show that the Indians referred to in the case of *Thompson* v. *Doaksum* were civilized or christianized. Under the authorities quoted above, to be sure, they had the right of occupancy, but that right continued only so long as it was recognized by the political power,— the executive or legislative departments of the government.

Of course the possession when abandoned by the Indians attaches itself to the fee without further grant; and this is true whether there be any record evidence in favor of the Indians, or not.   Their right exists only so long as they actually occupy the land.   So long as the defendants and their ancestors were in possession of the lands in controversy, there remained nothing to be done by them under the laws of Mexico in order to confirm their right, nor was there anything to be done by the Mexican government, or the officers thereof.   The rights of the Indians had been completely established.   We think that upon the facts agreed to in this case, the defendants are entitled to judgment for their costs.

Judgment reversed and cause remanded, with directions to enter judgment in favor of defendants for their costs.

McFARLAND, J., SEARLS, C. J., SHARPSTEIN, J., McKINSTRY, J., and TEMPLE, J., concurred.

Rehearing denied.