[L. A. No. 490. In Bank.—October 4, 1899.]

## J. DOWNEY HARVEY, Administrator, et cetera, et al., Respondents, v. ALLEJANDRO BARKER et al., Appellants.

Mexican Grant—Reservation—Rights of Indian Occupants.—A Mexican grant reserving roads and other usages does not include the reservation or preservation of any possessory or other right, or supposed right, of Indian occupants of the granted premises, or forbid the molesting of the Indians established thereon. [Beatty, C. J., McFarland, J., and Temple, J., dissenting.]

Id.—Conclusiveness of Patent—Claims of Indian Occupants not Presented—Case Overruled.—A patent of the United States to a Mexican grantee is conclusive upon all persons not claiming under a superior title, such as would enable them to resist successfully any action of the United States government in disposing of the property, and concludes all claims of mission or pueblo Indians to occupancy of the patented lands which were not presented to the board of land commissioners for confirmation. The case of *Byrne v. Alas*, 74 Cal. 628, overruled. [Beatty, C. J., McFarland, J., and Temple, J., dissenting.]

Id.—Construction of Act to Quiet Land Titles—Third Persons—Trust.—Indian occupants of the granted lands are not "third persons" who are entitled to protection within the meaning of the fifteenth section of the act of 1851 to quiet land titles; and there is no privity between them and the grantee, from which a trust can arise in their favor as against his grant, or the patent issued thereon, but the grantee holds in hostility to their claims.

Id.—Duty of Commissioners—Report as to Status of Indians—Presumption.—Under section 16 of the act of 1851 making it the duty of the commissioners to report the status of the mission Indians to Congress, that it might provide for their future government, the Indians were treated as dependent upon the care and generosity of the government, and were not classed as Mexican citizens, who held rights of property. The presumption is that the proper inquiry and report was made by the proper officers before the confirmation of a Mexican grant.

Id.—Decision against Occupancy of Indians.—A decision of the land commissioners, and other appropriate officers of the government of the United States, holding to the effect that the land granted at the time it was granted was vacant and subject to absolute alienation, is conclusive against all Indian and other claimants thereto.

APPEAL from a judgment of the Superior Court of San Diego County and from an order denying a new trial. E. S. Torrance, Judge.

The facts are stated in the opinion of the court.

Shirley C. Ward, and Frank D. Lewis, for Appellants.

White & Monroe, for Respondents.

VAN DYKE, J.—Plaintiffs claim title to the property in con-
troversy through a patent of the United States issued to J. J.
Warner, January 16, 1880, pursuant to the provisions of the act
of Congress of March 3, 1851, entitled "An act to ascertain and
settle the private land claims in the state of California." De-
fendants claim a possessory right as mission or pueblo Indians,
and by their answers form three groups, describing severally
the tracts of land alleged to be occupied by them, the first con-
sisting of nineteen hundred and seven acres; the second, two hun-
dred and sixty-six and forty-three one-hundredths; and the third,
one hundred and twenty acres. They base their right of pos-
session to such tracts of land upon the claim that their ancestors
were mission Indians, and that they have been in continuous
occupancy, use, and possession of said premises from time imme-
morial, and were in such possession at the time the rights of the
plaintiffs' grantor accrued under the Mexican government. At
the trial the plaintiffs introduced in evidence the United States
patent to Warner, and it was thereupon stipulated that the
lands described in said patent included the premises in contro-
versy, and that plaintiffs had succeeded to all the rights of the
patentee, and had paid all taxes levied or assessed upon said
premises since the patent issued. Thereupon, in support of the
claim on behalf of the defendants, there was offered in evidence
the *expediente* of two grants of the Mexican government, the first
being made June 8, 1840, to Jose Antonio Pico by Juan B.
Alvarado, governor of California, and the second made Novem-
ber 28, 1844, to Juan Jose Warner by Manuel Micheltorena,
governor general of California. The grant to Pico was of the
"land known by the name of 'Agua Caliente,' bounded by the
ranch of 'San Jose Valle,' . . . . subjecting himself to pay for
the place of worship and other improvements that be there be-
longing to the San Luis Rey Mission, and not molest (*prejudicor*)
the Indians that thereon may be established, and with the ap-
probation of the most excellent assembly of the department, and

the conditions following: 1. He is allowed to fence it in, without interfering with the roads, cross-roads, and other usages (*servidumbres*); he will possess it fully and exclusively, turning it to agricultural or any other use he may see fit, but within a year he shall construct a house thereon and live in it; 2. When the property shall have been confirmed to him, he shall petition the respective judge to give him possession thereof by virtue of this order, and shall mark out the boundaries on whose limits he shall fix the landmarks, some fruit and wild trees that may be of some utility; 3. The land of which donation is hereby made is of the extent mentioned in the plan which goes with the 'expedients.' The judge who should give possession thereof shall have it surveyed according to law, leaving the residue that may result to the nation for their purposes; 4. If he should fail to comply with these conditions he shall forfeit his title to the land, and it will be denounced by another."

Accompanying the grant to Warner of 1844, offered on behalf of the defendants, are the following papers:

The petition of Warner for the place known by the name as "Valle San Jose," which he alleges is vacant and situated east of the pueblo of San Diego, distant about twenty leagues, and surrounded by mountains.

"To the most R. P. Vincent Olivas:

"With the object of soliciting in property the place known by the name 'Valle de San Jose' (formerly occupied by the mission under your charge), I beg of you to be so kind as to inform me if, at the present day, the mission of San Diego does occupy the said land, and, if not, how long since it has been abandoned.

"JUAN J. WARNER."

"The 'Valley of San Jose' can be granted to the party who petitions for it, inasmuch as the mission of San Diego, to whom it belonged, has no means sufficient to cultivate and occupy it, and it is not so necessary for the mission.

"FR. VINCENT P. OLIVAS.

"Mission of San Diego, August 5, 1844."

"Office of the First Justice of the Peace, San Diego.

"In view of the petition which the party interested remits to this office, I beg to state that the said 'Valle San Jose' is, and has for the past two years, been vacant and abandoned, without

any goods nor cultivation on the part of San Diego; but said place belongs at the present time to the said mission, and at petitioner's request I sign this, in San Diego.

"August 6, 1844.                    JUAN MA MARRON."

The secretary forwarded the papers to the governor, as follows:

"Governor: The land which is petitioned for, it seems that there is no objection to its being granted according to the information which I enclose from the Rev. P. F. Vincent Olivas, and from the judge of San Diego, Juan Marron.   The petitioner is a naturalized citizen and is a person of good qualities, so that if your excellency does not dispose otherwise, you can accede to his petition.                    MANUEL JIMENO.

"Monterey, September 2, 1844."

(Same date.)

"Extend to him the title, and I order that he be obliged to procure the plan thereof within four months from this date, and should he fail to comply with such obligation within said term, this title will be null and of no value.

"So it is ordered and decreed.        MICHELTORENA."

The *deseno*, or sketch, accompanying the petition describing the property includes the entire San Jose valley.   The grant of Governor Micheltorena recites that, whereas one Jose Warner had petitioned for the land known by the name of "Valley de San Jose," giving the boundaries thereof, and "having previously complied with the notices and investigations on such matters, as prescribed by the laws and regulations, exercising the powers conferred on me, in the name of the Mexican nation, I have resolved to grant him the said land, declaring it by these presents his property, subject to the approbation of the most excellent assembly of the department, and to the conditions following, to wit."

The conditions are similar to those contained in the grant to Pico, with the exception that it omits entirely the clause "not to molest (*prejudicor*) the Indians that thereon may be established."

Thereupon Warner addressed the governor, stating that he would proceed under the grant, and subsequently commissioners were appointed to make an examination and report.   In their

report they say: "And it appearing from the said examination that the said concession in favor of Juan J. Warner was made in perfect conformity with what the laws prescribe in this particular, . . . . the concession is hereby approved in favor of Juan J. Warner of the place named 'Valle de San Jose,' adjudicated in property by the government of this department." This report was subsequently approved by the departmental assembly.

There was also offered on behalf of the defendants the petition of Warner to the land commission, under the act of Congress asking confirmation of his title to the lands in controversy, which it is claimed was based on the two grants referred to. But Warner in the petition says that he claims by virtue of grants from the Mexican nation a tract of land in the county of San Diego known as the "Valle de San Jose and Agua Caliente"; that so much as is known by the name of Agua Caliente was granted in 1840 to Jose Antonio Pico; that the same had become vested in the petitioner; that the remainder of the tract was subsequently granted to the petitioner in 1844 by Micheltorena; "that said second-named grant was approved and confirmed to the claimant by an act of the departmental assembly of California, passed on the seventeenth day of June, 1845. The claimant has no knowledge whether such first-named grant has or has not been so confirmed." By the decree of confirmation recited in the patent it is adjudged that "the land described in the grant" is a good and valid claim, and that said land is "known as the 'Valley of San Jose,' and is bounded and described in the original grant and map to which it refers; copies of which grant and map are on file with the papers in this case as follows, to wit, on the east by the entrance from San Felipe and the mountains; on the west by the mountains and defile of Aguando; on the north by the mountains; the southern limits being the canisal and the mountains to the extent of six square leagues, provided said quantity of six square leagues be contained within the boundaries." The patent contained the usual recitals that the said decree had become final, and a survey of the premises thereafter made and approved, and closing with the usual granting clause.

There were offered also on behalf of the defendants certain depositions and oral testimony to the effect that the defendants and their ancestors were mission Indians, and they had for-

merly been under the charge of the San Luis Rey Mission, and
had been in the exclusive use, occupancy, and possession of the
premises in controversy continuously since a time prior to the
inception of the plaintiff's title from Mexico, and had always
claimed and exercised the right to so use said property.

To these several offers made on behalf of the defendants, plain-
tiffs interposed objections, on the ground that the evidence .of-
fered was incompetent, irrelevant, and immaterial, and that the
patent was conclusive as to the title of the patentee. The court
reserved its ruling upon such objections, and thereafter sus-
tained the objections and excluded the testimony, to which rul-
ing the defendants excepted. Judgment went for the plaintiffs,
and the defendants subsequently moved for a new trial, which
motion was denied. The appeal is from the judgment and from
the order denying a new trial.

The position of counsel on behalf of the appellants may be
summarized as follows:

1. That the patent under which plaintiffs claim specified that
it "shall not affect the interest of third persons," and it is
claimed defendants are third persons, and are not thereby con-
cluded.

2. That the object of the act of Congress of March 3, 1851,
was accomplished by presenting, confirming, and patenting
Warner's claim to the land in question so as to relieve these de-
fendants of the necessity of presenting their claim to the board
of land commissioners.

3. That the decision of the board of land commissioners was
not conclusive except against the claimant, and the United
States government and parties claiming under the United States
government by title subsequent, as it was not the province of
such tribunals to pass upon conflicting titles as between indi-
viduals; that they were left just as they existed at the time of
the change of sovereignty.

4. That under the Mexican law, Warner held the legal title
subject to the easement of the Indians' possessory rights, and
that the confirmation of the legal title and issuance of the patent
in no way changed the character of such title, nor freed it from
the easement in favor of the defendants.

5. That in order to constitute one a "third person" under the
act of March 3, 1851, it is not essential that he should deraign

his title through the same specific grant as the party whose title was presented and confirmed; that it is only essential that the party claiming to be a "third person" should have a superior and anterior title to that confirmed; and the fact that his claim is hostile to the claim confirmed does not preclude the existence of a trust in his favor created by operation of law.

6: That it was not required that the title of the Indians should rest upon a specific grant, but their rights were protected by the general law of the land.

·7. That the United States assumed, both by its treaty and by the law of nations, to protect and preserve all existing private property rights within the ceded territory, which it is claimed include the rights of these defendants.

To sustain such claims the appellants rely upon *Byrne v. Alas*, 74 Cal. 628. It was stipulated in that case that the defendants were mission or pueblo Indians; that their ancestors and predecessors had been in the continuous, open, and notorious, peaceable, and exclusive possession, occupancy, and use of the premises in controversy, claiming adversely to all the world, ever since and for a long time prior to the establishment of the Mexican republic; and that their claim had not been presented for confirmation under the act of 1851; and that the premises were included within the exterior boundaries of the Mexican grant of the San Jacinto Rancho, and patented to Estudillo, from whom plaintiff derives title; and it was expressly provided in that grant that "he [Estudillo] shall in no way disturb or molest the Indians who are established or living thereon at the present time."

In the opinion of the court in that case it is said: "The patentee and his grantee under the law and the terms of the grant took the fee, subject at least to the right of occupancy by the Indians; and those rights are still preserved, unless the Indians forfeited them by failure to present their claims to the board of land commissioners appointed by the act of March 3, 1851." After reviewing the history of the Indians under the Spanish and Mexican governments, and their treatment by such governments, particularly mission or pueblo Indians, the opinion proceeds: "It becomes necessary to inquire to what extent, if at all, the confirmation of the Estudillo grant and the United

States patent affected the claim of these defendants. The fifteenth section of the act of March 3, 1851, provides that the decree or any patent issued under the act shall be conclusive between the United States and claimants only, and shall not affect the interests of third persons. Under this clause the rights of the Indians were preserved without presenting their claims. . . . . The patent, therefore, passed the legal title to the patentee burdened with whatever equities existed at the time of the cession of California in favor of third persons. Under the treaty the government of the United States stood in the place of the Mexican government. Its patent confirmed the grant, proclaimed it to be good, neither added to nor detracted from it in any way. It left the title of Estudillo just as it was at the time of the treaty, so far as the Indians were concerned, and it remained thereafter as to them just as it would have remained if the treaty had not been made. If the Indians were entitled to possession before the date of the patent, they were entitled to it afterward, so long as any of the community remained in actual possession. So far as we have been able to learn, nothing remained for them to do under the laws of Spain or Mexico to complete their rights of possession. Neither was there any act or writing required on the part of the government. Their right was, therefore, complete." Referring to section 16 of the act of March 3, 1851, which reads "that it shall be the duty of the commissioners herein provided for to ascertain and report to the secretary of the interior the tenure by which the mission lands are held, and those held by civilized Indians and those who are engaged in agriculture or labor of any kind, also those which are occupied and cultivated by pueblo or rancheros Indians," the court adds: "This language indicates that Congress did not intend that the rights of the Indians should be cut off by a failure on their part to present their claims, but that it should be the duty of the commissioners to ascertain and report the tenure by which they held their lands."

The case under consideration, it will be seen, differs materially from that of *Byrne v. Alas, supra.* Here it is shown that by the investigation of the Mexican officials and their reports, together with the grant to Warner, the land, some portions of which had formerly been occupied, was vacant and unoccupied

at the date of the grant, and in the grant the clause in reference to the rights of the Indians is omitted entirely. At the time of the Pico grant four years before there may have been some mission or pueblo Indians at the Agua Caliente, covered by that grant. The later grant, as already stated, embraced the whole valley; and this was the grant which was confirmed and patented, as clearly appears from the papers offered in evidence on the part of the defendants. This is also shown by the case of *Pico v. Warner*, 73 Cal. 17. In the opinion in that case it is said: "The findings are in substance as follows: On the eighth day of June, 1840, the governor of California granted to Jose Antonio Pico a tract of land known as the Agua Caliente, to the extent of four square leagues, the same being a part of the Valle de San Jose, which contains about ten square leagues, and is now situated in San Diego county. On the twenty-eighth day of November, 1844, the governor of California granted to the defendant J. J. Warner the tract of land known as the Valle de San Jose, to the extent of six square leagues." The court further say that the Pico grant was rejected and the Warner grant confirmed, and add: "In pursuance of the confirmation of the Warner grant the United States, on the twentieth day of February, 1880, issued to Warner its patent for the premises described in the complaint, including the Agua Caliente tract and other lands not embraced in the Pico grant."

It is useless for counsel on behalf of appellants to contend that the Warner grant is the same as the Pico grant in reference to the rights of the Indians. Not to interfere with roads and other usages (*servidumbres*), under the circumstances cannot be tortured into the equivalent of a reservation in the grant to "not molest (*prejudicor*) the Indians that thereon may be established."

The grant to Warner neither reserved nor preserved any possessory or other right or supposed right in the Indians; and the reason of the difference between the two grants in this regard is obvious. The record shows that before the Warner grant was issued an investigation was had by the proper Mexican officers, who reported "that the said 'Valle San Jose' is and has for the past two years been vacant and abandoned," and could be granted, "inasmuch as the mission of San Diego, to whom it be-

longed, had no means sufficient to cultivate and occupy it, and it is not so necessary for the mission."

Any arguments based upon the asserted rights of the mission or pueblo Indian under the Spanish or Mexican regime—and much of the argument on the part of the appellants is on this line—is entirely irrelevant in this case, as the grant under consideration did not interfere with any such alleged rights. Therefore, if it were permitted to go behind the patent to the grant itself, there was no defense on the part of the appellants to the plaintiffs' action.

But we are not permitted to go behind the patent in a case like this, and in the light of more recent decisions, both by this court and by the United States courts, *Byrne v. Alas, supra*, can no longer be considered as authority, more especially as to the consequences resulting from the nonpresentation of claims of title to land arising under the laws of Spain or Mexico, and the scope and effect of patents based upon such claims of title.

In *Minturn v. Brower*, 24 Cal. 644, it was held that claims founded on perfect titles—that is, such titles as require nothing further to be done at the date of the change of sovereignty—need not be presented for confirmation, under the act of Congress of 1851. And this seems to have been the theory up to the time of *Byrne v. Alas, supra*. In consequence, it is there held that an Indian title, such as this is claimed to be, namely, the right for themselves and descendants perpetually to possess, use, and occupy the land—without, however, the right of alienation—was a right or title prior and superior to any grant, and could be asserted successfully against such grant, or the patent issued thereon. The court say: "Under the treaty, the government of the United States stood in the place of the Mexican government. Its patent confirmed the grant, proclaimed it to be good, neither added to nor detracted from it in any way." At the time, or just prior to the decision in *Byrne v. Alas, supra*, *Phelan v. Poyoreno*, 74 Cal. 448, was also decided. In that case the plaintiff claimed under a patent issued upon a confirmed Mexican grant and the defendants under a grant which was alleged to have conveyed a perfect title, but it had not been presented for confirmation. The judgment below went for the plaintiff, but this court held the unconfirmed grant to be su-

perior in right to the patent, and reversed the judgment. The court there say: "Holders of titles to lands in the ceded territory which were perfect at the date of the treaty could, if they so elected, present them to the commission for confirmation, but were not bound to do so." At the same term *Dominguez v. Botiller*, 74 Cal. 457, was decided "upon the doctrine enunciated and for the reasons given in *Phelan v. Poyoreno*, 74 Cal. 448."

This latter case, by a writ of error, went to the supreme court of the United States, the error assigned being that this court erred "in holding that under the said act of Congress of March 3, 1851, it was not necessary for each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican governments to present such claim to the board of land commissioners under said act."

After a full and thorough discussion of the questions involved, the judgment of this court was reversed. (*Botiller v. Dominguez*, 130 U. S. 238.)

In *Beard v. Federy*, 3 Wall. 478, the contention was similar to that of the appellants, and the court there say: "The position of the defendants is that, as against them, the patent is not evidence for any purpose; that as between them and the plaintiff the whole subject of title is open precisely as though no proceedings for the confirmation had been had, and no patent for the land had been issued. Their position rests upon a misapprehension of the character and effect of the patent issued upon the confirmation of a claim to land under the laws of Spain and Mexico. In the first place, the patent is a deed of the United States. As a deed, its operation is that of a quitclaim, or rather a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when the proceedings were instituted by the filing of the petition before the board of land commissioners. In the second place, the patent is a record of the action of the government upon the title of the claimant as it existed upon the acquisition of the country. Such acquisition did not affect the rights of the inhabitants to their property; they retained all such rights and were entitled by the law of nations to protection under them to the same extent as under the former government. The treaty of cession also stipulated for such protection. The obligation to which the United

States thus succeeded was, of course, political in its character, and to be discharged in such manner and on such terms as they might judge expedient. By the act of March 3, 1851, they had declared the manner and terms on which they will discharge this obligation. They have there established a special tribunal before which all claims to lands are to be investigated; required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the government; authorized appeals from the decisions of the tribunal, first to the district and then to the supreme court, and designated officers to survey and measure off the land when the validity of the claims is finally determined. When informed, by the action of its tribunal and officers, that a claim asserted is valid and entitled to recognition, the government acts, and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government and is correctly located now, so as to embrace the premises as they are surveyed and described. As against the government this record, so long as it remains unvacated, is conclusive. It is equally conclusive against parties claiming under the government by title subsequent. It is in this effect of the patent as a record of the government that its security and protection chiefly lie." The court further defines the meaning of "third persons," mentioned in the fifteenth section of the act of 1851, whose rights are reserved in all patents issued under such act, as follows: "The term 'third persons' as there used does not embrace all persons other than the United States and the claimant, but only those who hold superior titles such as will enable them to resist successfully any action of the government in disposing of the property." The opinion in this case has been frequently quoted and approved in subsequent cases by the same court. In *Knight v. United States Land Assn.*, 142 U. S. 201, property is defined: "And by the term 'property,' as applied to land, all titles are included, legal or equitable, perfect or imperfect."

In *Houston v. San Francisco*, 47 Fed. Rep. 337, Justice Field, in rendering the opinion of the court, said: "The alleged grant, if one ever existed, was not presented for examination and confirmation to the board of land commissioners for the settlement of private land claims in California, under the act of Congress of March 3, 1851. The land embraced within the alleged grant thus became by the express declaration of Congress in that act, which was passed to carry out our treaty obligations with Mexico, and by the decisions of the supreme court of the United States thereon, public land no longer subject to any private ownership by virtue of the grant."

In *More v. Steinbach*, 127 U. S. 80, after referring to the act of Congress and quoting former decisions in reference to Mexican grants, the court say: "The doctrine invoked by the defendants that the laws of the conquered or ceded country, except so far as they may affect the political institutions of the new sovereign, remain in force after the conquest or cession until change be made, does not aid their defense. That doctrine is not applicable to laws concerning the alienation of any portion of the public domain, or to officers charged under the former government with that power. No proceedings affecting the rights of the new sovereign over public property can be taken except in pursuance of his authority on the subject."

In this case, therefore, if any rights whatever can be conceded to the appellants, under the former Mexican government, such rights were in the nature of private property, or a right dependent upon the will and pleasure of the state or nation. If, as claimed, it were a right to possess, occupy and use land, that amounted to a title to property. It being a title or right to property, whether in fee simple or possessory merely, derived from the Mexican government, under the act of Congress of 1851, as repeatedly held, a claim to that right was required to be presented for confirmation. If, on the other hand, it were a mere license at the pleasure of the former government to occupy the land, such right would not prevent that government from granting the land unencumbered with such right. This was the case in reference to pueblos under the former regime. The pueblos held title in trust for the use of the inhabitants, not conferred by special grant, but under the laws and regulations of Spain

and Mexico, and there were many cases where such governments made specific grants within the territorial limits of the pueblos which were, after the change of government, confirmed and patented by the United States, under the act of Congress of 1851. The United States, succeeding to all the rights and sovereignty of Mexico, had such power to grant all public lands—that is, all lands not claimed by private parties; and if owned or claimed by private parties, and not presented for confirmation, the claims were waived or forfeited, and such lands thereafter became public lands.

"The ascertainment of existing claims was a matter of vital importance to the government in the execution of its policy respecting the public lands; and Congress might well declare that a failure to present a claim should be deemed an abandonment of it, and that the lands covered by it should be considered a part of the public domain." Again: "The power to decide upon the validity of any claim presented to land in California by virtue of any right or title derived from the Spanish or Mexican government, as matter of original jurisdiction, is by the act of 3d of March, 1851, exclusively conferred upon the commissioners appointed under the first section of that act." Further: "The effect of the inquiry and decision of these tribunals upon the matter submitted is final and conclusive. If unfavorable to the claimant, the land 'shall be held and considered as a part of the public domain of the United States,' but, if favorable, the decrees rendered by the commissioners or the courts 'shall be conclusive between the United States and the claimants.' These acts of Congress do not create a voluntary jurisdiction that the claimant may seek or decline. All claims to lands that are withheld from the board of commissioners during the legal term for their presentations are treated as nonexistent, and the land as belonging to the public domain." And, "claims, whether grounded upon an inchoate or a perfect title, were to be ascertained and adequately protected." (*United States v. Castillero*, 2 Black. 17; *Newhall v. Sanger*, 92 U. S. 761; *More v. Steinbach, supra; Botiller v. Dominguez, supra.*)

Appellants' counsel, to ward off the effect of these decisions, particularly the Botiller case, characterize much of the lan-

guage used in such opinions as pure *dictum*. But the opinion in this latter case, as well as the others quoted, have been referred to and adopted by the same court in subsequent cases. In *Knight v. United States Land Assn., supra*, the court say: "The patent, being thus conclusive, can only be resisted by those who hold paramount title to the premises from Mexico and antedating the title confirmed." (*De Guyer v. Banning*, 167 U. S. 723.)

When unable to meet and answer opinions of the court, it is a custom of counsel, which would be "more honored in the breach than the observance," to characterize the language used as mere *dictum*. The answer to such criticism is well stated in the Botiller case itself: "We are unable to perceive any sufficient reason for calling these expressions of the court, whose judgment must be final on the subject, *dicta*, for we feel bound to say that they were observations pertinent to the matter under consideration, and seem to have met the entire approbation of the court in whose behalf they were uttered, and, as they embrace a very considerable period of time during which a contrary opinion would have saved much labor to the court, we must believe that the opinions thus expressed without variation were the well-considered views of this court when they were delivered."

Many of the questions raised here were presented in the case of *Los Angeles etc. Co. v. Thompson*, 117 Cal. 594. The plaintiffs there relied upon a patent issued on the confirmed grant of the ex-Mission San Fernando. The defense offered to show that the grant was void, for the reason that it was an attempted grant of mission lands reserved from and not subject to grant under the laws and regulations of the Mexican government; and that the board of land commissioners had no jurisdiction over the subject matter, and that the decree of confirmation was therefore void. Upon the objection of the plaintiff, the evidence was excluded, and this ruling of the court was the principal error assigned. This court, in affirming the judgment in favor of the plaintiff, reviews to some extent the cases already referred to, and says: "The board of land commissioners was authorized to adjudicate upon the validity of every claim for land in California which purported to be derived from the Spanish or Mexican government. The validity of the claim included

the authority of the governor to make the grant, as well as the existence or effect of the laws of Mexico concerning the same, and the jurisdiction of the board extended to the determination of each of these questions as fully as to determining whether there had been a compliance with the forms of law in making the grant; and its judgment thereon cannot be collaterally assailed on account of any error it may have committed in reference thereto." This case, aside from the cases from the United States courts already referred to, affords a complete answer to the contention that, the land being occupied by the Indians, could not be granted under the laws of Mexico.

But it is claimed that Warner took his title subject to the trust or right of the Indians. Neither the grant nor the patent contains anything to support this contention, and there is no privity between them and the grantee, or anything from which a trust could arise in their favor as against his grant or the patent issued thereon. They are not third persons within the meaning of the fifteenth section of the act of 1851, as already shown, but are mere strangers to the record.

But it is contended that, if the Indians are not third "persons" within the meaning of section 15 of the act of 1851, they are protected by section 16 of that act. By that section it is simply made the duty of the commissioners to report the status of the mission Indians to Congress, so that that body might be able to provide for their future government, and to treat them equitably and in accordance with the general policy of the United States. It would appear from that section that the Indians were treated as dependent upon the care and generosity of the government, and were not classed as Mexican citizens who held rights to property. The presumption is, that the proper inquiry or investigation was had and reported by the proper officers, as required by law, prior to the confirmation of the Warner grant.

From the foregoing it follows: 1. That the decision of the land commissioners and other appropriate officers of the government of the United States, holding to the effect that the land in question was at the time it was granted vacant and subject to absolute alienation, is conclusive on the defendants and all others; 2. That the grant to Warner of the "Valle

de San Jose" was not subject to any right or interest in the defendants, but that he claimed and held the land granted in hostility to the defendants' pretensions, and there is no trust relation existing between Warner and the said Indians; 3. That the patent issued to Warner upon the confirmed grant to the premises in controversy is conclusive against the defendants.

The judgment and order denying a new trial are affirmed.

Harrison, J., Garoutte, J., and Henshaw, J., concurred.

BEATTY, C. J., dissenting.—I dissent. The case presented by this record cannot, in my opinion, be distinguished in any material respect from *Byrne v. Alas,* 74 Cal. 628.

It is true the grant to Warner, under which the appellant claims, did not contain the provision quoted from the Estudillo grant (74 Cal. 635), that "he shall in no way disturb nor molest the Indians who are established or living thereon at the present time," but it was an express condition of the Warner grant that he should not interfere with the roads or other *"servidumbres,"* and it appears from the authorities cited by appellant that the word *servidumbres* had a meaning in Spanish law broad enough to include the servitude corresponding to the right of occupancy claimed by these defendants as successors of the christianized mission Indians, who, according to the evidence excluded by the superior court, were established and living upon some, at least, of the lands in controversy long before the date of the Warner grant.

The claim that our decision in *Byrne v. Alas, supra,* has been overturned by subsequent decisions of the supreme court of the United States, is, I think, unsupported by the cases cited by counsel, and in the absence of controlling authority I am unwilling to depart from the doctrine established here upon mature consideration.

McFARLAND, J., dissenting.—I dissent. In addition to what is said in the dissenting opinion of the chief justice I think that the privileges of the Indians would have been preserved even if, in the grant to Warner, there had been no express words of reservation which could be construed as including them—if there had been no express reservation whatever. I think that

under the general law applicable to the subject—written and un-written—running back through Mexican and Spanish dominion to the sixteenth century, the legal title to the lands like those in question here always passed subject to the right of the Indians to occupy them as they had been accustomed to "in such manner as that they shall not stand in need of the necessaries of life." (See *Byrne v. Alas*, 74 Cal. 628, and the authorities there cited.) I do not think that they were required to present their claims to the land commission, or that they are even to be charged with knowing that there was such a commission, or with a knowledge of the law generally. They are mere wards of the nation, and it is to be presumed that the nation has always recognized and protected their customary rights, and that all its grants are made with the understanding that the grantees know those rights, and take subject to them.

Temple, J., concurred in the last dissenting opinion.

Rehearing denied.